146 N.J. Super. 407 (1976)
370 A.2d 20
WILLIAM F. HYLAND, ATTORNEY GENERAL OF NEW JERSEY, RESPONDENT,
v.
JOHN ZUBACK, INDIVIDUALLY AND t/a ZUBACK'S BOAT & MOTOR WORKS, APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 1976.
Decided July 13, 1976.
*409 Before Judges CARTON, CRAHAY and HANDLER.
Mr. Roland A. Winter argued the cause for appellant (Messrs. Jacobson & Winter, attorneys; Mr. Howard J. Schmidt on the brief).
Mr. Douglas J. Harper, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
PER CURIAM.
This action was initiated on the complaint of the Attorney General filed under the Consumer's Fraud Act, N.J.S.A. 56:8-1 et seq. It involves a dispute between the owner of a small pleasure boat and a boat yard operator. Crystallized the allegations were that 
John Zuback, trading as Zuback's Boat and Motor Works (Zuback) was in the business of hauling, repairing and storing motorboats.
In October 1973 Joseph Roome asked Zuback for an estimate to replace an oil pan and front engine mount on his 1969 Ventura Cabin Cruiser, and was told that the cost of the work would be $50 for four hours labor plus the cost of parts. It was claimed that shortly later the estimate was confirmed and that the work would be completed "within a few days," whereupon the parties entered into a contract for the repairs.
Several weeks later Zuback telephoned Roome "to urge * * * replacement of an additional part * * * an alternator." Roome refused to have that work done.
On November 29, 1973 Zuback notified Roome that the job was completed and that the bill was $467.65, representing $80.15 for parts and $362.50 for 29 hours labor at $12.50 an hour. Roome paid the bill under protest, claiming Zuback threatened to increase the charges if payment was withheld.
*410 It was claimed that not only was the front engine mount not replaced, but that Zuback performed defective work in a variety of ways, causing additional damages to the boat totalling $300.
The gravamen of the cause of action was that
Respondent's [Zuback] demand and retention of consumer's [Roome] monies which include a labor charge greater than seven times the quoted and confirmed estimate for such work both individually and in conjunction with respondent's failure to inform the consumer of the labor charge overrun and an intent to perform work for which no prior authorization had been secured constitutes the use and employment of fraud, misrepresentation, deception, unconscionable commercial practices and the knowing concealment, suppression, and omission of material facts with the intent that the consumer rely upon said concealment, suppression and omission, all in violation of N.J.S.A. 56:8-2.
The relief sought was (1) the assessment of civil penalties in the amount of $2,000; (2) restorative and consequential damages to the consumer Roome, and (3) a "cease and desist" order against future illegal practices.
Following a hearing it was essentially held that (1) the transaction was within the purview of the act, and (2) appellant committed unconscionable commercial practices, contrary to N.J.S.A. 56:8-2.
It was ordered that (1) in the future Zuback give estimates in writing free of false promises designed to induce consumers to authorize repairs; (2) in the event it appeared that Zuback could not perform work in accordance with an original estimate, he discontinue work and not resume it until he had procured the consumer's approval. Zuback was assessed costs in the amount of $300 and ordered to pay civil penalties of $1,000. He was also directed to make compensatory restitution to Roome in the amount of approximately $350 and (3) desist from failing to perform work which had been agreed upon.
The testimonial hearing developed that in October 1973, when Roome accompanied by his brother delivered the boat to Zuback, it had just completed a five-hour trip during *411 which it operated without trouble. Roome wished to replace a leaking oil pan and a cracked front motor mount and testified that earlier in September 1973 he went to Zuback's boat yard to discuss the job and get an estimate.
According to Roome, Zuback told him he could do the job in approximately four hours and that parts and labor would total about $100. Zuback, on the other hand, maintained that he had told Roome that the job would take ten hours  four hours to remove the engine from the boat, one hour to replace the oil pan, and five hours to reinstall and align the engine. Zuback also stated that labor would be charged at $15 an hour, as opposed to Roome's recollection that labor costs would be $12.50 an hour. Zuback's testimony varied on the estimated price he had given Roome. At one point he stated the estimate was "a hundred and some odd dollars"; at another point the stated estimate was said to have been $175.
When Roome and his brother arrived at Zuback's dock the latter inspected the boat's engine, after which Zuback stated that the job could be done within the four-hour estimate. Roome's brother corroborated this testimony.
Zuback testified that when he commenced the job he immediately ran into unforeseen difficulties, which he attributed to unusually extensive rust and corrosion that had attacked the engine's fittings. As a result of the rust, bolts that should have simply unscrewed disintegrated or snapped off. By the time he had succeeded in getting the engine out of the boat, he had put 19 hours into the job.
Zuback further stated that upon removing the engine he noticed that the housing on the alternator was cracked, and he thereupon contacted Roome to suggest its replacement. Roome refused to authorize the additional work since the alternator had never given him any trouble. During the course of their conversation Roome inquired as to the progress of the work and if the job was coming in as estimated. Zuback testified that he reassured Roome, who *412 had asked about cost, by saying, "Don't worry about that. The work is going along fine."
In explaining his conduct in not telling Roome that the job was taking much longer than estimated, Zuback noted that it was his practice not to notify customers of overruns unless a really serious unforeseen problem came up. He regarded the overrun here as "penny ante stuff."
The job eventually consumed 29 hours and Roome was billed for $467. The bill contained a charge of $3.45 for a hydraulic hose which Zuback had damaged (via scorching with a torch) while attempting to burn out the corroded motor mounts. Zuback recounted that he did not charge Roome for hauling the boat out of the water; that he reduced his labor charges from $15 to $12.50 an hour, and that he did not bill Roome for a helper's labor totalling $60. These reductions were due to Zuback's sympathy for Roome in that the job had cost more than originally expected.
Prior to payment of the bill under protest, Roome inspected his boat and discovered that the front engine mount had not been replaced as requested. Zuback testified that the mount had not needed replacement.
The Saturday after he paid the bill Roome went to get his boat in order to remove it to its winter marina. The engine would not start immediately. After an hour or so of trying, Roome located a disconnected resistor wire, reconnected it, and the engine ran. However, when the engine did start finally, it idled at such a high rate that Roome would not put it in gear for fear of damaging the engine. Roome next discovered that (1) his alternator was not putting out a charge due to a sheared terminal; (2) the wire grounding his gasoline tank was disconnected, and (3) the boat's horn had been broken off. Roome thereupon made arrangements to have his boat towed to its nearby winter mooring.
In an April 1974 letter from A & B Boat Sales it was noted that their inspection of the boat revealed, among other defects, (1) a broken field terminal on the alternator, (2) *413 a misconnected field wire, (3) a bent carburetor linkage, (4) a bent choke rod, and a broken front motor mount which "should have been replaced while engine was out of boat." In a January 18, 1974 letter concerning an inspection of the boat conducted by representatives from Mercury on December 3, 1973 (four days after Roome picked up his boat from Zuback) it was noted that the field terminal was broken and that the rear mount fiber washers on the replaced engine mounts had been installed incorrectly. Roome ultimately spent an additional $300 to put his boat back into operating condition.
First, we disagree with appellant's assertion that the Consumer Fraud Act is aimed solely at the "shifty, fast talking and deceptive merchant" and does not reach a businessman such as he  "a nonsoliciting artisan."
The act provides public and private remedies to a consumer who complains of unconscionable commercial practices, N.J.S.A. 56:8-8, and there is no reason to honor the argument that an unconscionable practice is subject to remedy only when widespread. In Kugler v. Romain, 58 N.J. 522 (1971), it was observed that the Legislature intended to confer on the Attorney General "the broadest kind of power to act in the interest of the consumer public * * *." 58 N.J. at 537.
The hearing officer concluded that two of appellant's practices in this matter were unconscionable: (1) the failure to replace the motor mount and (2) the failure to inform the consumer of the repair cost overrun. On this record we cannot join in the holding that the failure to replace the motor mount was a proscribed practice.
It was Roome's opinion that the cracked front motor mount represented a safety hazard and that if it broke completely "it would allow the engine to be free to waft and turn and go in any direction." Zuback, however, explained that the front motor mount on an inboard-outboard engine does not bear any torque load, its sole function being to hold the engine in proper alignment. In his opinion, the *414 crack in the "webbing" of the front mount did not present a safety hazard at all and that its replacement would cause unnecessary additional expense.
Zuback never attempted to bill Roome for work undone. Rather, in Zuback's expert opinion, the work was not needed. This charge of unconscionable practice appears more part of the cost overrun component of this case.
We are satisfied, however, that the record supports the holding that the cost overrun was an act of a quality which the Legislature sought to suppress. Under the act "merchandise" includes goods and services offered directly or indirectly to the public. N.J.S.A. 56:8-1(c).
The hearing officer found that Zuback had originally given Roome a four-hour $100 estimate for the oil pan replacement. That finding was bolstered independently of the participants' testimony through the letter from Mercury noting that their "flat rate manual" shows a labor time of 4.1 hours to replace an oil pan including removal and replacement of the engine.
On November 10, when Zuback telephoned Roome about the cracked alternator, he had already put some 19 hours of labor into the job. Yet, when Roome inquired whether the job was progressing as planned, Zuback assured him that everything was fine and that he need not worry. Rather than taking four hours at a cost of $100 the job actually took 29 hours and cost $467.
The Consumer Fraud Act denominates an unlawful practice as any
* * * unconsionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby * * * [N.J.S.A. 56:8-2]
*415 It is clear from the quoted portion of the act that the evil aimed at is commercial deception which may be subject to sanctions under the act's authority regardless of whether the attempt to deceive succeeded or injury in fact resulted. Kugler v. Koscott Interplanetary, Inc., 120 N.J. Super. 216, 228 (Ch. Div. 1972).
If Zuback had contacted Roome upon running into difficulties and sought authorization to exceed the estimate, Roome might well have given that authorization. Here, however, Zuback ignored his previous estimate in favor of presenting Roome with a fait accompli, at which point he had few options. If he wanted his boat returned and to avoid storage fees, he had to pay.
Zuback's act in this case went beyond that of mere omission. He actually lulled Roome into a false sense of calm concerning what the job would actually cost. Thus, under the statute's broad definitions Zuback engaged in deception and misrepresentation and that conduct constituted a violation of the act.
We do agree with appellant that on this record the totality of the quantum of sanctions imposed was not warranted and requires modification. We do not agree with the respondent's assertion that imposition of the $1,000 civil penalty was "minimal considering the gravity of the offense." The complainant was made whole and the State recovered the costs of its action. It was appellant's first offense and while it was a clear violation of the act, we hold that the penalty was disproportionate to the offense. We are satisfied that in addition to the other sanctions ordered against appellant, the interest of justice will be served by reducing the civil penalty to $100. It is so ordered.
As modified the judgment is affirmed.