206 N.J. Super. 11 (1985)
501 A.2d 990
D'ERCOLE SALES, INCORPORATED, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
FRUEHAUF CORPORATION, ALSO KNOWN AS FRUEHAUF DISTRIBUTING COMPANY AND FRUEHAUF TRAILER COMPANY, DEFENDANT-APPELLANT, AND GENERAL MOTORS CORPORATION, BEYER BROTHERS GMC CORPORATION, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 1985.
Decided November 21, 1985.
*13 Before Judges KING, DEIGHAN and BILDER.
Charles E. Reuther argued the cause for appellant (Riker, Danzig, Scherer & Hyland, attorneys; Gerald A. Liloia, of counsel; Charles E. Reuther, on the brief and reply brief).
Donald L. Garber argued the cause for respondent-cross-appellant D'Ercole Sales Incorporated (Michael I. Lubin, on the brief).
Elmer K. Skiba argued the cause for respondent Beyer Brothers GMC Corporation.
Carroll A. Morley argued the cause for respondent General Motors Corporation (Morley, Cramer, Tansey, Haggerty & Fanning, attorneys; Carroll A. Morley, of counsel and on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
Under the facts and circumstances of this appeal we are required to determine, among other things, whether in a commercial transaction a purchaser of a product is restricted to a claim for damages for breach of warranty under the Uniform Commercial Code  Sales, N.J.S.A. 12A:2-101 et seq., for a defective product or whether the Consumer Fraud Act, N.J.S.A. 56:8-2, may apply, as an unconscionable commercial practice, where the seller fails to rectify the defect.
Plaintiff D'Ercole Sales Incorporated (D'Ercole) ordered a new tow truck from Fruehauf Corporation (Fruehauf) who custom built and assembled the vehicle. The chassis, cabin, *14 engine and drive train were manufactured by General Motors Corporation (GMC) and purchased from Beyer Brothers GMC Corporation (Beyer Brothers), a dealer of GMC. The tow truck broke down on the date of delivery to plaintiff and several times thereafter despite attempts by Beyer Brothers to rectify the mechanical failure. After the last breakdown Beyer Brothers kept the tow truck for some four to six weeks to determine the cause of the mechanical failure and concluded that the source of the problem was the responsibility of Fruehauf. Without telling plaintiff the nature of the defect, Beyer Brothers tendered delivery of the tow truck to plaintiff, which was refused. Plaintiff filed a complaint against GMC, Fruehauf and Beyer Brothers for negligence, breach of contract, breach of warranty, rescission and damages under the Consumer Fraud Act. Fruehauf crossclaimed against GMC and Beyer Brothers for indemnity and contribution.
At the conclusion of plaintiff's case, the trial judge dismissed the claim based on the Consumer Fraud Act against General Motors and also dismissed plaintiff's claims against all defendants for punitive damages. R. 4:37-2(b). At the close of all of the evidence, the trial judge dismissed all claims against GMC and Beyer Brothers, including Fruehauf's crossclaims for contribution and indemnity. R. 4:40-1.
The jury returned a $22,500 verdict against Fruehauf under the Consumer Fraud Act. The trial judge molded the verdict by trebling the damages under the Act to $67,500 and added $3,000 attorneys fees for a total verdict of $70,500. The trial judge denied Fruehauf's subsequent motion for a new trial as to liability. R. 4:49-1. On the issue of damages, he ordered a remittitur of the judgment from $22,500 to $8,500 to reflect a deduction of $14,000 which plaintiff recouped from the resale of the tow truck. The verdict was adjusted for treble damages to the sum of $25,500 plus the $3,000 attorneys fees for a total judgment of $28,500. Although plaintiff accepted the remittitur, Fruehauf appealed and plaintiff cross-appealed for a reinstatement of the original verdict.

*15 I.
Plaintiff is engaged in the business of towing motor vehicles and the sale of motorcycles, snowmobiles, and accessories. In March 1981, plaintiff ordered a new tow truck from Fruehauf. A completed tow truck is not manufactured on an assembly line but must be custom built from a cab and chassis which is designed to be converted into a tow truck. Fruehauf assembled and sold the tow truck and certified it as a completed unit. Fruehauf did not manufacture any of the component parts but acted as the completed vehicle manufacturer. GMC manufactured the cab and chassis, including the engine and drive train which Fruehauf purchased from Beyer Brothers. Other manufacturers, not parties to this action, supplied other parts to the tow truck, such as lights, tow equipment, a front end "push" bumper, and other equipment.
Fruehauf made several alterations and additions to the original GMC's cab and chassis in order to assemble a completed tow truck. These included the attachment of a tow truck body on the chassis, alteration of the electrical, fuel and throttle-control system, and the installation of substitute gas tanks on the vehicle. The tanks were changed after Fruehauf discovered that the original GMC gas tanks were too large to accommodate the tow apparatus which had been requested by the plaintiff. The tow truck was completed and delivered to plaintiff in June 1981 at a purchase price of $20,656. After delivery plaintiff installed other optional equipment at a cost of approximately $900.
Fruehauf gave a limited warranty to plaintiff for all materials and workmanship provided by it. General Motors issued a limited warranty on the chassis, cab, engine and drive train. On the day the tow truck was delivered to plaintiff it broke down. Robert D'Ercole, principal of plaintiff, called Fruehauf, and, since the problem was mechanical, Fruehauf dispatched Beyer Brothers to pick up the tow truck. A few days after the tow truck was returned to D'Ercole by Beyer Brothers, it broke *16 down again. When it was returned a week later by Beyer Brothers, plaintiff refused to accept it because of "what appeared to be a rubber hose which ran from the gas tank to the carburetor, and because the body had numerous chips and scratches." Beyer Brothers picked up the vehicle and returned it approximately two days later when it was accepted by D'Ercole.
In July the tow truck again broke down. Once more it was picked up by Beyer Brothers who retained it for over one month. In August it was re-delivered to plaintiff's place of business by a representative of Beyer Brothers and a GMC regional manager. Plaintiff refused to accept the vehicle because "it still had a hose from the tank to the carburetor, the bumper had been pushed in, there were dents and scratches that had not been fixed, and the carpets were soiled." Plaintiff also pointed out that although he had only logged approximately 100 miles on the vehicle, its odometer registered 956 miles. Since plaintiff was unable to reach an accommodation with the parties to the transaction, this action was instituted.
A substantial portion of the evidence at trial concerned the cause of the mechanical failure of the tow truck. Defendant Beyer Brothers maintained that all of their work on the tow truck in June, July and August was diagnostic in nature. This included the testing and installation of several replacement parts in an effort to discover the cause of the problem. During the course of testing, they discovered that the "sending unit" of the fuel tank, which consists of a fuel gauge and a line to draw fuel from the tank, was the cause of the vehicle's problem. The sending unit of a General Motors' fuel tank is a steel pipe[1] which extends almost to the bottom of the tank. When the mechanics for Beyer Brothers removed the tanks in the tow truck, they discovered that the sending unit steel pipe extended *17 only half-way to the bottom of the tank and that a rubber hose was fitted to the pipe extending it to nearly the bottom of the tank. The replacement of the fuel tanks was one of the alterations made by Fruehauf when assembling and constructing the tow truck.
At trial, according to William Dubois, an expert who testified on behalf of Beyer Brothers, and Paul Bary and Bernard Lee who testified on behalf of GMC, the submersion of the rubber hose in the gasoline caused the rubber to soften. When the fuel started to pass through the hose into the gas line, a pressure vacuum was created and the soft rubber hose collapsed blocking the flow of gasoline through the fuel line to the carburetor. The experts ascribed this fuel starvation as the basis of plaintiff's problems and attributed it solely to Fruehauf. This information was conveyed to Fruehauf's service manager, Guilfoil, and GMC and Beyer Brothers asserted that it was Fruehauf's responsibility to make the necessary repairs. Fruehauf refused to acknowledge any responsibility and took no action to rectify the condition.
After discovery of the source of the problem, Beyer Brothers restored the vehicle to the original factory specifications except with respect to the gas tanks. The rubber hoses were removed from the metal pipes of the sending units leaving short stand pipes. The fuel starvation condition was apparently corrected, but because of the short stand pipe which did not extend to the bottom of the gas tank, the tow truck would not operate even though the tank was half full of gas and was so indicated on the gas gauge.
Fruehauf presented no proof contrary to the opinions of GMC's and Beyer Brothers' experts regarding the tow truck problems. The thrust of Fruehauf's defense was that the defect with the tow truck was the result of a malfunction in the engine manufactured by General Motors and the faulty repairs made by Beyer Brothers. Fruehauf maintained that certain work orders of Beyer Brothers in evidence supported the argument *18 that Beyer Brothers was involved not only in diagnostic work but also with repairs.
On this appeal Fruehauf contends that: (1) the trial court erred in dismissing its crossclaims for contribution and indemnity against Beyer Brothers and GMC; (2) the verdict was tainted because it was based upon prejudice, partiality and passion as a result of improper comments by plaintiff's counsel in the summation; (3) it was plain error to submit the issue of consumer fraud against Fruehauf to the jury, and (4) that the trial court erred in its charge on consumer fraud. Plaintiff cross-appeals contending that the trial court improperly invaded the province of the jury in directing a remittitur of the verdict and further abused its discretion by awarding insufficient attorneys fees to plaintiff under the Consumer Fraud Act.

II.
Since the rights and liabilities of the parties are primarily grounded in the law of sales, Springfield Motors Distributor's, Inc. v. Ford Motor Co., 98 N.J. 555, 571-576 (1985), we begin with the Uniform Commercial Code  Sales, N.J.S.A. 12A:2-101 et seq. (UCC). The sales order sets forth a description of the tow truck and equipment on the face sheet which has the following notation:
GOODS SOLD HEREUNDER, UNLESS CLEARLY MARKED AS BEING MANUFACTURED BY FRUEHAUF CORPORATION, ARE SUBJECT TO SECTION C(i) OF THE WARRANTY WHICH APPEARS ON THE REVERSE SIDE OF THIS ORDER.
Above the signature of the purchaser also is a notation concerning the warranty and terms on the reverse side. The warranty provides:
A. Except for tires, to which a separate tire warranty applies, the Fruehauf Division Corporation (Seller) hereby warrants to the first purchaser thereof, for a period of time (5) years after delivery, all new trailers, equipment, and other goods manufactured by Fruehauf Corporation (Manufacturer) to be free of defects in workmanship and material when properly maintained and used in normal service. "Normal service" means usage in the manner and for the purposes for which such goods are generally purchased and utilized and, with respect to cargo carrying vehicles, also means (unless different capabilities are *19 plainly stated on the face hereof) the loading, unloading and carriage of uniformly distributed legal loads of noncorrosive cargo, properly secured, in a manner which does not subject the vehicles to strains or impacts greater than normally imposed by lawful use on well-maintained public roads, with gross vehicle weights which do not exceed the gross vehicle weight rating (GVWR) specified on the vehicle identification plate affixed to the vehicle by the Manufacturer prior to delivery. THE FOREGOING WARRANTY IS MADE SOLELY TO THE FIRST PURCHASER FROM SELLER OR FROM AN AUTHORIZED DEALER OR DISTRIBUTOR OF THE SELLER AND IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES EXPRESSED OR IMPLIED BY LAW OR OTHERWISE.
B. NO WARRANTY OR MERCHANTABILITY OR FITNESS FOR PURPOSE OTHER THAN SET FORTH ABOVE IS MADE BY SELLER.
C. SELLER MAKES NO WARRANTY WHATSOEVER AS TO (i) Parts, accessories or other goods manufactured by suppliers other than Fruehauf Corporation. Seller will assign to Customer any warranties extended to Seller by makers or suppliers of such goods; (ii) Used goods delivered hereunder, regardless of manufacture, all of which are delivered "as is", (iii) Any goods which after delivery hereunder have been impaired or altered by anyone other than Seller or one of its authorized service representatives, unless, in Seller's reasonable opinion, such repairs are in no way responsible for the condition complained of, or (iv) Goods which are not defective but may wear out and have to be replaced during the Warranty period including for example, but without limitation thereto, light bulbs, paint, brake lining, brake drums and the like.
Beneath the warranty within a rectangular border is the following:
LIMITATIONS ON SELLER'S LIABILITY
Seller and Customer agree that Seller shall have no liability for any cargo loss, loss of use or any other incidental or consequential damages arising out of this order or which are alleged to have been caused by any of the goods delivered hereunder.
Customer and Seller further agree that Customer's sole remedy for any defects in new goods delivered hereunder, whether Customer's claims arises under the warranty set forth above, or otherwise, shall be limited to the repair or replacement at Seller's option, within the (5) years after delivery of such goods to the first purchaser, of any defective goods of which notice of the defect is given by Customer to Seller immediately after such defect is or ought to have been discovered, and, which goods are returned to Seller within (10) days after Seller requests their return for inspection and/or repair or replacement.
The foregoing warranty, disclaimer and limitation must be examined in light of the requirements of the UCC. The UCC provides for express warranties regarding the quality of the goods, N.J.S.A. 12A:2-313, and implied warranties of merchant-ability, *20 N.J.S.A. 12A:2-314, and fitness for a particular purpose, N.J.S.A. 12A:2-315. But the seller may exclude or modify liability on warranties if the exclusion or modification is conspicuous. N.J.S.A. 12A:2-316. Further, as set forth in Fruehauf's sales order, a seller may limit liability and the buyer's remedy to a repair and replacement of the defective goods or parts, N.J.S.A. 12A:2-719(1)(a), see Herbstman v. Eastman Kodak Co., 68 N.J. 1, 11-12 (1975), or limit or exclude consequential damages, unless the limitation or exclusion is unconscionable. N.J.S.A. 12A:2-719(3).

* * *
In general, the remedies available to a buyer are set forth in N.J.S.A. 12A:2-711. Whether a buyer refuses to accept the product, (Zabriskie Chevrolet, Inc. v. Smith, 99 N.J. Super. 441 (Law Div. 1968)), or justifiably revokes acceptance (Pavesi v. Ford Motor Company, 155 N.J. Super. 373 (Ch.Div. 1978)), he has a right to cancel the agreement or seek damages. N.J.S.A. 12A:2-711(1); Ramirez v. Autosport, 88 N.J. 277, 290 (1982). Since the non-conformity here either substantially impaired the value of the tow truck, N.J.S.A. 12A:2-608, or circumstances caused the limited remedy of repair or replacement of parts to fail of its essential purpose, N.J.S.A. 12A:2-719(2), we need not determine whether plaintiff has rightfully rejected the tow truck or whether there has been a revocation of acceptance. See Ramirez at 288-290. In either event when a seller delivers goods that are not as warranted, plaintiff's measure of damages for a breach of warranty is the difference between the price paid for the tow truck and its market value in the defective condition. N.J.S.A. 12A:2-711(1), 713, 714; Spring Motors Distributors, Inc. v. Ford Motor Co., supra, 98 N.J. at 566; Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 64 (App.Div. 1980).

* * *
Turning to the facts in the present case, the purchase price of the tow truck from Fruehauf was $20,656. D'Ercole purchased extra options for $900 for a total price of $21,556. The vehicle *21 was sold pending litigation for $14,000 which apparently was accepted by the parties as market value of the tow truck in its non-conforming condition. Therefore, plaintiff's damages under the UCC are $7,556 as the difference between the price paid for the tow truck and its market value in its defective condition.
Since the jury returned a verdict of $22,500 against Fruehauf under the Consumer Fraud Act, on its cross-appeal plaintiff contends that the trial judge improperly invaded the province of the jury in directing a remittitur of the verdict to $8,500 to reflect the deduction of $14,000 which plaintiff recouped from the resale of the tow truck. Fruehauf points out that are were two possible explanations for the jury verdict of $22,500 where the actual damages amounted to $7,556. First, the jury, who was informed of the resale price, neglected to subtract the $14,000 received on resale of the tow truck from the total damages.
As to the second explanation, Fruehauf notes that the trial judge in his charge informed the jury that whatever damages they determined, he would then treble them under the Consumer Fraud Act. Alternatively then, Fruehauf submits that the jury subtracted the resale proceeds of $14,000 from the vehicle cost of $21,556 to come up with a basis of $7,556 damages, then, contrary to instructions, rounded that amount to $7,500 and trebled the damages. In any event, the verdict of $22,500 was clearly defective and the trial judge was within his discretion to mold the verdict. Webber v. McCormick, 63 N.J. Super. 409 (App.Div. 1960); Bishop v. Harski, 191 N.J. Super. 109 (Law Div. 1983).

III.
Next we consider the applicability of the Consumer Fraud Act under the facts and circumstances in this matter. Fruehauf objected to the consumer fraud claim being presented to the jury and maintains that the trial judge failed to instruct *22 the jury on the element of intent. N.J.S.A. 56:8-2 of the Consumer Fraud Act provides:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.
Fruehauf's contention concerning the requirement of intent under the Consumer Fraud Act was raised and rejected in Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 377 (1977). The Supreme Court noted that the Act limited the intention requirement to violations involving "concealment, suppression or omission of any material fact." Id. at 377.
The capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice. Intent is not an essential element. Since consumer protection is the ultimate goal, the standards of conduct established by the Act and implementing regulations must be met regardless of intent except when the Act specifically provides otherwise. [Id. at 378].
The statutory elements of N.J.S.A. 56:8-2 are in the disjunctive rather than the conjunctive. As such, a violation may occur if there is a showing of "unconscionable commercial practice." Hyland v. Aquarian Age 2000, Inc., 148 N.J. Super. 186, 191 (Ch.Div. 1977). There need be no showing of a deceptive or fraudulent act. Ibid.; State v. Hudson Furniture Co., 165 N.J. Super. 516, 520 (App.Div. 1979).
In order to determine the applicability of the Consumer Fraud Act, it is appropriate to first ascertain the purpose and meaning of the Act. The Consumer Fraud Act, originally enacted in 1960, is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate. Daaleman v. Elizabethtown Gas Co., *23 77 N.J. 267, 270 (1978); Fenwick 72 N.J. at 376-377. In enacting the Consumer Fraud Act the Legislature was concerned with sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kinds of selling or advertising practices. Daaleman 77 N.J. at 271. It is not aimed solely at the shifty, fast-talking and deceptive merchant but reaches nonsoliciting artisans as well. Hyland v. Zuback, 146 N.J. Super. 407, 413 (App.Div. 1976). The Act is broadly designed to protect the public even when a merchant acts in good faith. Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 470 (App.Div. 1982).
[T]he entire thrust of the Consumer Fraud Act is pointed to products and services sold to consumers in the popular sense. Such consumers purchase products from retail sellers of merchandise consisting of personal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place. [Neveroski v. Blair, 141 N.J. Super. 365, 378 (App.Div. 1976); emphasis in original].
While the term "consumer" is not defined within the act the definition of "person" includes a corporation, N.J.S.A. 56:8-1(d), therefore we need not labor as to whether the corporate plaintiff may qualify as a consumer.[2] Further, in view of our *24 determination stated infra, it is unnecessary to determine whether the transaction concerning the purchase of a tow truck for commercial purposes comes within the scope of the Consumer Fraud Act. See New Topic Service, Am.Jur.2d, Consumer and Borrower Protection, § 212 (1982); see also Annotation, "Scope and exemptions of State deceptive trade practice and consumer protection Acts," 89 A.L.R.2d 399, 408, 414 (1974).
As initially enacted, the Consumer Fraud Act was enforceable only by the Attorney General. N.J.S.A. 56:8-3, 8. See Kugler v. Romain, 58 N.J. 522, 537. In 1971 the Legislature amended the Consumer Fraud Act to permit a private right of action, treble damages, costs and attorneys fees. Act of June 29, 1971, c. 247, § 7 L. 1394, N.J.S.A. 56:8-19. In addition, the same act broadened the definition of "unlawful practices" in N.J.S.A. 56:8-2 to include "any unconscionable commercial practice." See Bossemeyer, "Re-Examining New Jersey's Consumer Fraud Act: Loopholes for Professionals?", 7 Seton Hall L.J. 45, 47-49 (1983); Skeer v. EMK Motors, Inc., supra, 187 N.J. Super. at 470-473. However, the Act does not define "unconscionable commercial practices."
Even before the addition of "unconscionable commercial practices" as unlawful under the Consumer Fraud Act, the Supreme Court engrafted the concept of "unconscionability" as an ingredient of the Act. Kugler v. Romain, supra, 58 N.J. at 543-545. The Court turned to the UCC concerning the concept of "unconscionability" in N.J.S.A. 12A:2-302 and 719(3) and noted that the term "unconscionability" likewise was not defined in the Code. The Court referred to "unconscionability" as an "amorphus concept obviously designed to establish a broad business ethic." Id. at 543. Justice Francis wrote that: "The framers *25 of the [Uniform Commercial] Code naturally expected the courts to interpret it liberally so as to effectuate the public purpose, and to pour content into it on a case-by-case basis." Ibid.
Notwithstanding its amorphus concept, the Court broadly defined unconscionability as
[t]he standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing. [Id. at 544].
In the context of selling to "the uneducated, the inexperienced and the people of low incomes" by a professional seller, "a material departure from the [unconscionable] standard puts a badge of fraud on the transaction and here the concept of fraud and unconscionability are interchangeable." Id. at 544.
Thus we are confronted with the question of whether a breach of warranty in a commercial sales transaction per se, is a violation of the Consumer Fraud Act or whether, in addition, the conduct of Fruehauf brings the transaction within the purview of that Act. In this respect it is necessary to bear in mind that the UCC deals with unfair or unconscionable agreements or clauses in agreements. On the other hand, the Consumer Fraud Act deals, not only with agreements, but primarily with conduct in connection with the sale or advertisement of merchandise or real estate. N.J.S.A. 56:8-2. However, an unconscionable commercial practice or conduct under the Act is not limited to the initial transaction but extends to "the subsequent performance of such person [involved in the transaction]." Id. Unfairness (unconscionability) is measured by analyzing the potential effect the conduct will have upon the consumer or marketplace. See Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981); Schubach v. Household Fin. Corp., 375 Mass. 133, 137, 376 N.E.2d 140, 144 (1978). But a breach of warranty, or any breach of contract, is not per se unfair or unconscionable, see Banville v. Huckins, 407 A.2d 294, 298 (Sup.Jud.Ct., Me. 1979), and a breach of warranty alone does not violate a consumer protection statute. Wachovia Bank & Trust Co. v. Smith, 44 N.C. App. 685, 691, 262 S.E.2d *26 646, 650 (1980). Unfairness is not inherent in the circumstances of the breach of a contract within the meaning of the North Carolina Unfair Trade Practices Act so as to support treble damages simply because the breach was intentional. United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4 Cir.1981), cert. den. 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981).
On the other hand, it has been held that a breach of warranty or failure to honor warranty obligations may be sufficient to establish a violation of a state consumer protection statute. Am.Jur.2d, supra, § 227 at 198; see Annotation, "Practices forbidden by state deceptive trade practice and consumer protection acts," 89 A.L.R.3d at 449, 519 (1974). However, because of the disparate nature of consumer sales practice acts it is of little precedential value to cite cases without reference to the particular statute or regulation promulgated thereunder. E.g., the case of Giannasca v. Everett Aluminum, Inc., 13 Mass. App. 208, 431 N.E.2d 596, 599 (1982), stands for the proposition that a "substantial and material breach" of warranty entitles a plaintiff to relief under the Massachusetts Regulation of Business Practice and Consumer Protection Act, G.L.C. 93A. Yet upon analysis the Attorney General, pursuant to c. 93A, § 2(c) promulgated a rule which provides in pertinent part: "It shall be an unfair or deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty." A warranty is defined under the Rules and Regulations to include: "An express warranty ... or guarantee [including] any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Slaney v. Westwood Auto, Inc., 366 Mass. 688, 702, 322 N.E.2d 768, 778, 89 A.L.R.3d 433, 446 (1975).
Again, in Ford Motor Co. v. Mayes, 575 S.W.2d 480 (Ky. Ct. App. 1978), the Kentucky Court noted that a limitation of the buyer's remedy was permitted under § 2-719(1) of the UCC limiting the buyer's remedy "to repair and replacement of non-conforming goods or parts was valid." The pickup truck *27 purchased by defendants had a bent frame which caused major repairs some seven or eight times and substantially impaired the value of the truck under § 2-608 of the UCC. Under the Kentucky Consumer Protection Act, all "unfair" acts or practices in the conduct of any trade or commerce was declared unlawful. "Unfair" is defined as "unconscionable" under the Act. It was held that Ford's insistence that the buyers must acquiesce in further attempts to repair the defect rather than receive reimbursement of the purchase price was an untenable position. The court cited Pavesi v. Ford Motor Co., supra, and noted that there Ford also persisted in attempting to repair the defects rather than reimburse the purchase price or tender a substitute vehicle. The court held that, not only was there an obvious breach of warranty, but that the persistent conduct of Ford as a matter of general policy was "unconscionable" under the Consumer Protection Act. The Kentucky Consumer Protection Act applied to purchases of goods primarily for "personal, family or household purposes" but did not provide for the imposition of treble damages. Notwithstanding the "unconscionability" of Ford's conduct the court disallowed punitive damages under general contract law but allowed counsel fees under the Act.
Giannasca and Mayes illustrate differences between Consumer Protection Acts adopted by various States. Generally, the states have modeled their legislation on the Federal Trade Commission Act or have adopted the Uniform Consumers Sales Practice Act (CSPA), 7A Uniform Laws Annotated 231 (1971) (ULA) or the Uniform Deceptive Trade Practice Act (1966), id. at 265 or variations thereof. Am.Jur, supra, §§ 205, 209. It has been estimated that literally hundreds of statutes governing specific aspects of the relationship between consumers and professionals who deal with them have been enacted, id. at n. 39 citing Sebert, "Enforcement of State Deceptive Trade Practice Statutes," 42 Tenn.L.Rev. 689, 691 (1975), with the vast majority of the statutes being based on the Federal Trade Commission Act. See Leaffer and Lipson, "Consumer *28 Actions Against Unfair or Deceptive Acts or Practices: The Private Uses of Federal Trade Commission Jurisprudence," 40 Geo.Wash.L.Rev. 520 (1980). But the conduct prohibited by such state legislation varies widely from state to state. Am. Jur., § 206 at 185. However, generally, the statutes do not apply to strictly private transactions not undertaken in the course of trade or business, but require a consumer relationship. Id. § 209 at 187.
In the present case, when the tow truck initially developed mechanical problems on the date of delivery, Fruehauf reasonably assumed that the problem was with the engine and called Beyer Brothers to pick it up. Beyer Brothers also assumed that the problem was mechanical involving the engine and thereby covered by its warranty or the warranty of GMC. At that point Fruehauf was justified in its opinion that the responsibility for the breach of warranty reposed in either Beyer Brothers or GMC. See DeSimone v. Nationwide Mut. Ins. Co., 149 N.J. Super. 376, 381 (Law Div. 1977); see also Hyland v. Zuback, supra, 146 N.J. Super. at 413-414. However, after some ten weeks of experimenting and diagnosing the fuel starvation problem, when Beyer Brothers and GMC finally determined that the cause of the fuel starvation was the installation of the gas tanks by Fruehauf, this then obviously became a matter of a claim against Fruehauf. The question then is whether the recalcitrance of Fruehauf in failing to honor its warranty and its intransigent and shoddy attitude toward plaintiff transcends the threshold of an "unconscionable commercial practice." We think not.
In denying Fruehauf's motion for a new trial, the trial judge pinpointed the basis for the cause of action under the Consumer Fraud Act:
When the cause was found, Fruehauf, in effect, disowned the problem, and based on all of these proofs, it was perfectly proper to submit to the jury whether that represented unconscionable conduct. I felt that that was a fact issue for a jury. It was squarely within the terms of the Consumer Fraud Act, whether that constituted that type of conduct on the part of a seller of an *29 automobile to a purchaser constituted unconscionable conduct. The jury determined that it did. [Emphasis supplied]
An insight into the nature of the consumer transaction contemplated by the New Jersey Consumer Fraud Act and whether Fruehauf's conduct amounts to an "unconscionable commercial practice" can be gleaned from an analysis of the Uniform Consumer Sales Practice Act, (UCSPA) 7A U.L.A. 231 et seq. The uniform acts were drafted by the National Conference of Commissioners on Uniform State Laws and recommended for adoption in all states. The Uniform Consumer Sales Practice Act represents an effort to crystalize the best elements of contemporary federal and state regulation of consumer sales practices to effect harmonization and coordination of the federal and state regulations. Ibid. Although the UCSPA has been adopted by only three states it is particularly analogous to the New Jersey Consumer Fraud Act because the norm for violation of the UCSPA is "an unconscionable act or practice." Id. § 4(a). Further, a violation may occur before, during or after the transaction. Ibid.
Unconscionability of an act or practice is a question of law for the court but the parties are given a reasonable opportunity to present evidence as to the setting, purpose, and affect to aid the court in making its determination. UCSPA at § 4(b).
Subsection 4(c) sets forth a certain criteria to assist the court in determining unconscionability:
(c) in determining whether an act or practice is unconscionable, the court shall consider circumstances such as the following of which the supplier knew or had reason to know:
(1) that he took advantage of the inability of the consumer reasonably to protect his interests because of his physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement, or similar factors;
(2) that when the consumer transaction was entered into the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers;
(3) that when the consumer transaction was entered into the consumer was unable to receive a substantial benefit from the subject of the transaction;
(4) that when the consumer transaction was entered into there was no reasonable probability of payment of the obligation in full by the consumer;

*30 (5) that the transaction he induced the consumer to enter into was excessively one-sided in favor of the supplier; or
(6) that he made a misleading statement of opinion on which the consumer was likely to rely to his detriment.[3]
Without limiting the scope of a deceptive act or practice, § 3(b) of the UCSPA itemizes 11 deceptive acts or practices such as misrepresentation: (1) of the durability or components of a product (Commissioner's Comments  3(b)(1)); (2) as to the quality of the product, 3(b)(2); (3) that used products are new, 3(b)(3); (4) that the sale of goods is other than as advertised, 3(b)(5); (5) that the repair or replacement is needed when it is not, 3(b)(7); (6) that a specific price advantage exists when it does not, 3(b)(8); (7) that the seller is authorized when in fact he is not, 3(b)(9), and (8) that rights, remedies or obligations exist as a warranty or disclosure of warranty such as that a warranty is unconditional when in fact it is not. 3(b)(10). The Act forbids (9) "fire" or "lost our lease" sales (Commissioner's Comment, 3(b)(4)); (10) bait and switch advertisements, 3(b)(6), and (11) referral commission arrangements or rebate discounts on future referrals (Commissioner's Comment, subsec. (b)(11)).
The above deceptive acts and practices and the criteria therefore are consonant with the type of consumer transactions and the nature of the conduct contemplated by the Consumer Fraud Act, N.J.S.A. 56:8-2. In enacting the Consumer Fraud Act, the Legislature
recognized that the deception, misrepresentation and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods frequently produce an adverse affect on large segments of *31 disadvantaged and poorly educated people, who are wholly devoid of expertise and least able to understand or to cope with "sales oriented," "extroverted" and unethical solicitors bent on capitalizing upon their weakness, and who therefore most need protection against predatory practices. [Kugler v. Romain, supra, 58 N.J. at 536].
In consumer goods transactions, unconscionability must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like which are stamped unlawful under N.J.S.A. 56:8-2. Id. at 544. See also Kugler at 535, 541-544.
The conduct of Fruehauf need not "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the commercial world." Levings Trustee v. Forbes and Wallace, Inc., 8 Mass. App. 498, 396 N.E.2d 149, 153, (1979). However, attorneys fees, costs and treble damages are powerful weapons for the consumer and invoke a formidable remedy. Any breach of warranty, or of any contract for that matter, is unfair to the non-breaching party. Yet, "[i]n a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted, but this is why remedial damages are awarded on contract claims. If such an award is to be trebled, the ... legislature must have intended that substantial aggravating circumstances be present." United Roasters, Inc. v. Colgate-Palmolive Co., supra, 649 F.2d at 992. We do not deem that the disavowal by Fruehauf, offensive though it may be, is deplorable enough to constitute an "unconscionable commercial practice" under the Consumer Fraud Act nor do we deem that the conduct, unjustified as it may be, transcends an "unconscionable consumer practice" under the facts and circumstances of this commercial transaction. There is no question but that when Fruehauf "disowned the problem," it breached its warranty but this does not equate with a consumer fraud. This is not to say, however, that a breach of warranty under a sales agreement may not, under given circumstances, also violate the Consumer Fraud Act.
*32 We therefore hold that it was error to submit the issue of consumer fraud by Fruehauf to the jury.
[The remaining contentions of Fruehauf are rejected.]
The judgment in favor of plaintiff against Fruehauf for $28,500 is vacated and judgment is entered in favor of plaintiff against Fruehauf in the amount of $7,556. The judgment in all other respects is affirmed.
NOTES
[1] This pipe was referred to at trial as a "stand pipe", "siphon tube" and "pickup tube."
[2] However, we note that the Consumer Credit Transaction Act, N.J.S.A. 56:11-1 defines a "consumer" as a natural person and the Consumer Contracts Act, known as the "plain language act", N.J.S.A. 56:12-1 et seq. defines a "consumer contract" as one with an individual. Id. The Truth-in-Consumer for a Contract, Warranty and Notice Act, known as the "lemon law" pertaining to the purchase of an automobile or motorcycle also defines consumer as one who acquires property or service which is "primarily for personal, family or household purposes." N.J.S.A. 56:12-15. Under Chapter 9 of the UCC, consumer goods are defined as goods which are used or bought for use primarily for personal, family or household purposes as contrasted to equipment, farm products and inventory. N.J.S.A. 12A:9-109(1). The Magnuson-Moss Warranty  Federal Trade Commission Improvement Act, 15 U.S.C.A. 2301 et seq., which was designed to protect consumers concerning written warranties, defines a "consumer product" as tangible personal property which is distributed in commerce and which "is normally used for personal, family, or household purposes...." Id. at § 2301(1). Likewise, the Uniform Consumer Sales Practice Act, which again is designed to protect the consumers, defines a "consumer transaction" as one involving "an individual for purposes that are primarily personal, family, or household" or related to a business opportunity by an individual. Consumer Sales Practice Act, § 2(1).
[3] Compare the above criteria with the criteria prescribed by the Federal Trade Commission to determine whether a practice is deceptive or unfair: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise  whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen). [Federal Trade Commission v. Sperry & Hutchinson, 405 U.S. 233, 244, 92 S.Ct. 898, 905, 31 L.Ed.2d 170 (1972); 29 Fed.Reg. 8355 (1964)].