216 N.J. Super. 618 (1987)
524 A.2d 841
WAYNE E. CHATTIN, ET UX, FRANK J. INGARGIOLA, ET UX; JOSEPH MARTELLA, ET UX; ANTHONY BUCCANFURNI AND PATRICK SMITH ON BEHALF OF THEMSELVES AND ON BEHALF OF A CLASS OF HOMEOWNERS, PLAINTIFFS-RESPONDENTS,
v.
CAPE MAY GREENE, INC., A NEW JERSEY CORPORATION, DEFENDANT-APPELLANT, and CAPITOL PRODUCTS CORPORATION, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1986.
Decided January 30, 1987.
*621 Before Judges MICHELS, SKILLMAN and LANDAU.
Leonard C. Horn argued the cause, for appellant (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys, Glenn R. Gronlund, on the brief).
*622 Thomas J. Vesper argued the cause, for respondent (Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz, attorneys, Thomas J. Vesper, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
In the mid-1970's defendant, Cape May Greene (CMG), constructed and sold approximately 80 moderately priced homes in a Ventnor development called Kings Bay West. Aluminum windows and doors manufactured by Capitol Products (Capitol) were installed in the homes. These windows and doors proved to be unsatisfactory. The homeowners complained that condensation collected on them, causing damage to the window sills and woodwork, and that the windows and doors were not airtight.
Some 35 homeowners filed claims for arbitration pursuant to a homeowners' warranty agreement (HOW) which CMG had entered into with each of them. The arbitrator decided in favor of the homeowners and ordered CMG to install ventilation systems in the homes and to repair the damage already caused by the condensation. If this work was not completed within 60 days, CMG was ordered by the arbitrator to pay each homeowner $350 "in full settlement of all claims."
CMG filed suit to enjoin enforcement of the arbitration award. The remaining homeowners in the development  those who had never gone to arbitration  were joined as parties to the action. The homeowners filed a counterclaim against CMG asserting claims of negligence, breach of warranty and violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. Capitol, the Home Owners Warranty Corporation, and the insurer under the HOW program, American Bankers Insurance Company of Florida, were joined as third-party defendants.
On a pretrial motion the trial judge dismissed CMG's complaint, thereby rejecting its attack on the arbitration award, and redesignated the homeowners as plaintiffs and CMG and Capitol *623 as defendants.[1] The trial judge also ruled that the homeowners who had arbitrated were barred from seeking any additional recovery against CMG but that they could pursue their claims against Capitol. The case was certified as a class action, the plaintiff class being composed of two subclasses  homeowners who had arbitrated claims against CMG (the arbitrating subclass) and those who had not arbitrated (the nonarbitrating subclass).
On the eve of trial plaintiffs settled their claims against Capitol for $200,000. Since the claims against the other third party defendants had been dismissed previously, the case was tried against CMG only. Furthermore, since the claims of the arbitrating subclass had been barred by pretrial motion, only the claims of the nonarbitrating class were presented at trial.
At the close of all evidence, the trial judge entered a directed verdict in favor of plaintiffs on their consumer fraud claims. The negligence and breach of warranty claims against CMG were submitted to the jury, which returned verdicts in favor of plaintiffs. The jury also found that Capitol had been negligent in constructing the windows and doors.[2] It attributed 25% negligence to Capitol and 75% to CMG. In accordance with the trial judge's instructions, the jury limited its determination of damages to the replacement costs of each defective window, which was determined to be $533, and of each defective door, which was determined to be $676.
The trial judge molded the verdict of compensatory damages by reducing the replacement costs of the windows and doors by the 25% negligence which the jury attributed to Capitol and multiplying these figures by the total number of windows and doors in the homes of the nonarbitrating subclass. These *624 calculations resulted in the entry on December 20, 1984 of a judgment in favor of plaintiffs of $181,642.50.
The trial judge determined that the only plaintiffs entitled to damages pursuant to the Consumer Fraud Act were ones who had purchased their homes from CMG and relied on a written brochure which the judge found to violate the Act. The thirteen plaintiffs found to qualify under these criteria were awarded additional "punitive damages" of $156,702, representing double the full replacement cost of their windows as determined by the jury (the consumer fraud claims relate solely to the windows and not to the doors), counsel fees of $112,781.50 and costs of $16,463.69. Accordingly, a molded judgment in the total amount of $467,589.69 was entered on April 15, 1985.[3]
CMG has appealed and plaintiffs have cross-appealed.[4] CMG argues the trial judge committed the following errors: (1) not enforcing a settlement agreement which had been negotiated among all counsel before trial, (2) not dismissing the claims of the nonarbitrating plaintiffs based upon their breach of a contractual obligation to arbitrate, (3) directing a verdict in favor of plaintiffs on their consumer fraud claims, (4) prejudicial *625 evidence and other rulings during trial, and (5) molding the jury verdict incorrectly. Plaintiffs argue that the trial judge committed the following errors: (1) barring the arbitrating subclass from seeking any additional recovery from CMG, (2) barring some members of the nonarbitrating subclass from the recovery of damages under the Consumer Fraud Act, and (3) not awarding prejudgment interest. We affirm the part of the judgment awarding compensatory damages in all respects. However, we conclude that the trial judge erred in granting a directed verdict in favor of plaintiffs on their consumer fraud claims. Therefore, we reverse the part of the judgment awarding damages for consumer fraud and remand for a new trial on this part of the case.

I
According to certifications submitted by CMG and co-defendant Capitol, plaintiffs' counsel stated at a settlement conference conducted in the trial judge's chambers that the case could be settled for $120,000 if his offer were accepted by 4:30 p.m. on December 20, 1983. Prior to the deadline defendants accepted the offer. CMG argues that this acceptance created a binding settlement agreement.
In response to a motion to enforce this alleged settlement, plaintiffs' counsel submitted a certification which stated that he had informed counsel for defendants that any settlement agreement would be contingent upon a majority vote of the members of the class. The only commitment made at the settlement conference, according to plaintiffs' counsel, was that he would recommend the $120,000 settlement figure if defendants agreed to it by December 20th. He further stated that he recommended the settlement but the members of the class refused to approve it.
Counsel for CMG submitted a certification which asserted that plaintiffs' counsel never informed him that any settlement would be subject to a confirmatory vote by the members of the *626 class. Similarly, counsel for Capitol submitted a certification which asserted that plaintiffs' counsel had advised the trial judge and counsel for defendants that he would recommend, and the class representatives would accept, $120,000 to settle the case.
No testimony was taken on the motion to enforce the settlement and hence the trial judge did not have a full record upon which to resolve counsels' conflicting versions of their settlement discussions. Rather, the trial judge concluded that he had the responsibility to determine "what is fair and just under the circumstances." He found that the members of the class had rejected the settlement unanimously. The trial judge also found that the members of the class "were of the belief that no one would bind them or even could bind them to any settlement or compromise without a majority vote of the class." Therefore, he concluded that "an appropriate exercise of judicial discretion" would not permit enforcement of the alleged settlement.
There is a strong public policy favoring the settlement of litigation. Jannarone v. W.T. Co., 65 N.J. Super. 472, 476-477 (App.Div. 1961), certif. den. 35 N.J. 61 (1961). Accordingly, settlement agreements are judicially enforceable. DeCaro v. DeCaro, 13 N.J. 36, 44 (1953). Indeed, a court ordinarily will enforce a settlement without reviewing the reasonableness of its terms. Honeywell v. Bubb, 130 N.J. Super. 130, 136 (App. Div. 1974). However, where fraud, mutual mistake or other compelling circumstances are shown, a court has the discretion to deny enforcement of a settlement agreement. Honeywell v. Bubb, supra, 130 N.J. Super. at 136.
This is a class action. Settlements of class actions are treated differently from other settlements. Although most types of litigation can be settled without the involvement of the court, see Pascarella v. Bruck, 190 N.J. Super. 118, 124 (App. Div. 1983), certif. den. 94 N.J. 600 (1983), R. 4:32-4 requires notice of any proposed settlement of a class action to be given *627 to the members of the class and for the settlement to be approved by the court. See Morris Cty. Fair Housing Council v. Boonton Tp., 197 N.J. Super. 359, 368-370 (Law Div. 1984), aff'd o.b. 209 N.J. Super. 108 (App.Div. 1986); see generally Manual for Complex Litigation, (2 ed. 1985) § 30.41, § 30.212; 3B J. Moore and J. Kennedy, Moore's Federal Practice, (2 ed. 1985) § 23.80.
The evident purpose of these requirements is to protect class members from a settlement which is not in their best interests. While an individual litigant can protect his own interests by refusing to agree to a settlement which he conceives to be inadequate, most class members ordinarily are not involved in settlement negotiations. Furthermore, class members may take differing views on whether to agree to a settlement. Therefore, court approval serves as a substitute for consent to a settlement by members of the class.
The basic test for court approval of a settlement of a class action is whether it is fair and reasonable to the members of the class. City of Paterson v. Paterson General Hospital, 104 N.J. Super. 472 (App.Div. 1969), aff'd 53 N.J. 421 (1969); cf. Morris Cty. Fair Housing Council v. Boonton Tp., supra, 197 N.J. Super. at 370. If the settlement is fair and reasonable, it may be approved even though individual members of the class refuse to consent. City of Paterson v. Paterson General Hospital, supra; Kincade v. General Tire & Rubber Co., 635 F.2d 501, 507 (5th Cir.1981). Indeed, a settlement of a class action may be approved even in the face of a majority vote by members of the class to disapprove the settlement. See TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 462-463 (2nd Cir.1982). Nevertheless, since court approval is a substitute for the usual right of litigants to determine their own best interests, the overwhelming opposition of members of a class to a proposed settlement is a significant consideration militating against court approval. See Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1215-1218 (5th Cir.1978), cert. den. 439 *628 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Furthermore, if it is shown that members of the class have been treated unfairly by a class representative or counsel for the class, this too may be an important consideration militating against approval of the settlement. Cf. Saylor v. Lindsley, 456 F.2d 896, 899-901 (2nd Cir.1972).
We are satisfied that the trial judge did not abuse his discretion in refusing to enforce the alleged settlement in this case. Regardless of what plaintiffs' counsel may have communicated to defendants' counsel, the members of the class had been given the impression that no settlement would be consummated except by a majority vote of their members. Furthermore, the vote on the settlement reflected overwhelming opposition. The trial judge concluded that the imposition of the settlement upon the members of the class under these circumstances would not be fair and just. In our view this was a proper exercise of his discretionary power pursuant to R. 4:32-4.
Furthermore, whatever plaintiffs' counsel may have said during settlement negotiations, defendants' counsel could not have understood that they had a final settlement as of December 20, 1983. Rather, they had to have been aware that the proposed settlement was subject to court approval pursuant to R. 4:32-4. And even if defendants were under the impression that the trial judge probably would approve the settlement since he had suggested the settlement figure, they also should have been aware that he might reconsider his position if overwhelming opposition to the proposed settlement was expressed by members of the class.

II
CMG argues that the jury verdict should be set aside because the parties in whose favor it was entered (the nonarbitrating subclass) should have been required to arbitrate before bringing suit. On their cross-appeal, plaintiffs argue that the trial *629 judge erred in holding that the arbitrator's award barred the arbitrating subclass from seeking any judicial relief against CMG. Since both arguments involve the arbitration provision of the "Limited Warranty Home Warranty Agreement" entered into between CMG and each of the plaintiffs, it is appropriate to consider the two arguments together.
The arbitration provision of the home warranty agreement states as follows:

Conciliation and Arbitration. HOW provides for conciliation and for nonbinding arbitration conducted by the American Arbitration Association under its Expedited Home Construction Arbitration Rules (or by another approved organization). No fee or deposit is required. No arbitration decision may call for performance beyond the scope of the warranty provided in this agreement.
After it receives your "Demand for Dispute Settlement" form, the Local HOW Council will assign a conciliator, who will attempt to work out a voluntary conciliation agreement between you and the Builder as to the settlement of your claim. After you have attempted conciliation, you may demand arbitration of any unresolved warranty dispute between you and the Builder.
You are not required to submit your claim to dispute settlement unless you wish to do so. However, under Public Law 93-637 you may not file suit against the Builder until you have submitted your claim and a decision has been reached. Suit may be permitted under other state or federal laws and you are only required to wait for a decision for 40 days (47 if you do not contact the builder before filing a claim) after which time you may sue. In addition, the insuror is not required to pay you under the insurance coverage unless you complete arbitration.
There are three general observations which should be made regarding this arbitration provision. First, it is not mandated by statute. Although the arbitration provision refers to Public Law 93-637, which is the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq., neither party argues that Magnuson-Moss is applicable and regulations adopted by the Federal Trade Commission interpret Magnuson-Moss not to apply to the sale of a home. 16 C.F.R. § 700.1(e)-(f); see also Kravitz v. Homeowners Warranty Corp., 542 F. Supp. 317, 321 (E.D.Pa. 1982). In addition, CMG contracted to sell homes to plaintiffs prior to the effective date of the New Jersey New Home Warranty and Builders' Registration Act, N.J.S.A. 46:3B-1 et seq., and hence that Act is not applicable either. Therefore, the *630 arbitration provision is purely contractual. Second, an arbitrator's decision under this provision is not binding. The home warranty agreement states:
After you [referring to the purchaser of a home] receive the decision, you must decide whether or not to accept it. You may reject the decision in which case it has no legal effect on you.
Third, the home warranty agreement provides limited warranties and specifically contemplates that the purchaser of a home may have additional legal rights which can be pursued without following the procedures set forth in the agreement. Under the title "Other Rights," the agreement states:
This warranty gives you specific legal rights. You may also have other legal rights which vary from state to state. This agreement does not affect any rights of you or the Builder under any other express or implied warranty.
Thus, the arbitration provision involved in this case is more limited than the provisions frequently found in commercial contracts for binding arbitration of all disputes arising under the contract.

A.
We are satisfied that the trial judge correctly determined that the members of the nonarbitrating subclass were not foreclosed from seeking recovery from CMG simply because they failed to seek arbitration. Initially, we have some doubt whether the home warranty agreement should be read to compel arbitration before filing suit. The arbitration provision states that "under Public Law 93-637" a claim must be submitted to arbitration before suit can be filed. This statement may be viewed simply as a notification to home purchasers of an apparent requirement of federal law  now conceded to be incorrect  rather than an agreement between the parties for mandatory arbitration.
In any event, even if the arbitration provision is viewed as mandatory, CMG waived its right to insist upon arbitration. CMG initiated this litigation by filing a complaint which contended that the claims made by the arbitrating subclass were beyond the scope of the arbitration provision. Consequently, *631 the nonarbitrating subclass had to anticipate that any attempt to arbitrate would be resisted by CMG.
Furthermore, the nonarbitrating homeowners correctly considered CMG's complaint to be directed against not only the arbitrating homeowners but also them. Although it is unclear from the face of CMG's complaint whether the class of homeowners being sued included those who had not filed for arbitration, the notice of pendency of the class action was addressed to "all purchasers of Kings Bay Homes" and defined the defendant class as persons "who have purchased Kings Bay Homes from Cape May Greene, Inc. prior to July 17, 1978." In addition, the relief sought by the complaint included not only vacation of the arbitration award but also a declaration that "[t]he windows are not defective," and that "[p]laintiff has not warranted the level of relative humidity in defendants' houses, and is not in any way responsible for correcting the window condensation problem caused by excessive humidity." Hence, the entry of judgment in accordance with the demands of the complaint would have impacted upon all purchasers of homes, not just those who had sought arbitration. Most importantly, we see no indication that CMG ever took the position prior to trial that exhaustion of the arbitration provision of the home warranty agreement was a mandatory precondition to purchasers of homes pursuing their claims through litigation.
In McKeeby v. Arthur, 7 N.J. 174, 182 (1951), the Court held that "[w]hen all parties to an agreement to arbitrate elect to prosecute their respective claims by actions at law, and institute and carry forward the course thus elected, the logical, indeed the necessary, result of that course is an abandonment of arbitration and a revocation of the agreement to pursue that form of adjudication." Similarly, in LaStella v. Garcia Estates, Inc., 128 N.J. Super. 173, 177 (App.Div. 1974) rev'd on other grounds 66 N.J. 297 (1975), the court recognized that "an arbitration agreement may be waived and upon waiver judicial remedies will be available." See also 6A Corbin, Contracts (1962) § 1443; Annotation, "Defendant's participation in action *632 as waiver of right to arbitration of dispute involved therein," 98 A.L.R.3d 767 (1980).
The abandonment or waiver by CMG of any right to arbitrate the claims of the nonarbitrating subclass is manifest. CMG filed a class action which placed in issue the nonarbitrating homeowners' entitlement to relief and thereafter litigated the case for more than six years without ever asserting that those homeowners were foreclosed from pursuing their claims because they had failed to exhaust the contractual arbitration provision. Moreover, had CMG raised this defense early in the litigation, the nonarbitrating homeowners could have first arbitrated and thereafter litigated their claims since, as previously noted, any decision by an arbitrator under the home warranty agreement would not have been binding. Instead, CMG first raised this defense at trial as a last minute procedural tactic to defeat these homeowners' claims. This course of conduct constituted a waiver of any right to arbitration. See McKeeby v. Arthur, supra.

B.
Capitol moved for summary judgment to limit the recovery of the arbitrating subclass to the $350 awarded by the arbitrator. CMG apparently joined in this motion. Although the trial judge concluded that Capitol could not rely upon the award because it had not been a party to the arbitration proceedings, he ruled that the arbitrating subclass's recovery against CMG would be limited to the $350 awarded by the arbitrator. We affirm this ruling.
We note initially that the arbitrating homeowners never attempted to repudiate the arbitration award. On the contrary, they consistently defended their entitlement to the award. They raised the arbitration award as an affirmative defense to CMG's complaint and eventually moved successfully to dismiss CMG's challenge to the award. Furthermore, when the insurer of CMG's home warranty agreement obligations moved for *633 dismissal upon the deposit into court of the full amount of the arbitration award, plaintiffs did not oppose the motion. This sum was then apparently deposited into court and presumably remains available for distribution. Around this same time, plaintiffs filed a pretrial memorandum which included a statement that "[the arbitrating homeowners] claim that they as a subclass have a right to accept the $350.00 and proceed for excess damages against both defendant, Capitol Products, not a party to the arbitration, and the plaintiff, Cape May Green, Inc." In short, the arbitrating subclass never attempted to revoke their acceptance of the arbitration award or to argue that CMG waived its right to enforce the arbitration award by bringing this litigation.[5] Therefore, we have no occasion to decide whether the arbitrating subclass could have completely repudiated the arbitration award at the commencement of the litigation. Cf. McKeeby v. Arthur, supra.
Where a party seeks to retain the benefits of an arbitration award and also to secure an additional recovery against a party to the arbitration proceedings, the court must determine what was submitted to arbitration because an arbitration award bars "only such matters as were comprehended within the scope of the submission and passed on by the arbitrator." Rosa v. Transport Operators Co., 45 N.J. Super. 438, 441-442 (App.Div. 1957); see also American Renaissance Lines, Inc. v. Saxis Steamship Co., 502 F.2d 674, 678 (2nd Cir.1974).
Plaintiffs argue that the arbitrating subclass did not submit to arbitration either any claims regarding their doors or any claims of negligence or violation of the Consumer Fraud Act. Therefore, they argue that their warranty claims regarding *634 the windows are the only claims barred by the arbitration award.
The record concerning the scope of the submission to arbitration is sparse. In seeking arbitration the arbitrating homeowners submitted a "defect description," which stated:
Condensation which accumulates on window frame. This condition results in mold which creates a health problem, some rotting window frames. During extreme cold (temp. under 20 degrees F.) all exits are frozen shut except front door. In the event of a fire during a cold spell one may be trapped in his or her home due to the exits being inoperative.
This "defect description" is not written with legal precision. It also is directed at the manifestations of the alleged defect, not its cause. However, the references to exits being frozen shut and to the danger of occupants being trapped in the home in the event of a fire indicate that the homeowners' complaints related not only to the windows but also to the doors. Furthermore, while the arbitrator's award does not specifically refer to the doors, it does direct that a ventilation system be installed, which presumably was designed to correct the condensation problem that was affecting both the windows and the doors. Therefore, we reject the arbitrating subclass's contention that the submission to the arbitrator did not include any complaint concerning the doors.
In arguing that they remained free, despite acceptance of the arbitration award, to litigate claims of negligence and consumer fraud because only claims of breach of warranty were submitted to arbitration, the arbitrating homeowners assume that principles of collateral estoppel determine what matters are resolved by an arbitration award. They note that the doctrine of collateral estoppel applies only to an issue decided in a prior adjudication which is identical to an issue presented in subsequent litigation. See, e.g., State v. Gonzalez, 75 N.J. 181, 186 (1977); Allesandra v. Gross, 187 N.J. Super. 96, 104-106 (App.Div. 1982). The arbitrating homeowners argue that since issues relating to negligence and consumer fraud were not presented to the arbitrator, they should have been permitted to *635 litigate those issues. See Rush, Urology Assoc. v. Kuhn, Smith & Harris, 193 N.J. Super. 389, 394-396 (App.Div. 1984), certif. den. 99 N.J. 142 (1984).
However, we are convinced that under the circumstances present here the preclusive effect of an arbitration award rests on principles of res judicata rather than collateral estoppel; that is, what is involved here is claim preclusion, not simply issue preclusion. As the Court pointed out in Mazzilli v. Accident & Casualty Ins. Co., 26 N.J. 307, 313-314 (1958), quoting City of Paterson v. Baker, 51 N.J. Eq. 49, 53 (Ch. 1893):
There is a plain difference, resting on obvious considerations of justice, as was held in Cromwell v. Sac County, 94 U.S. [4 Otto] 351, 24 L.Ed. 195, and again in Bissell v. Spring Valley, supra [124 U.S. 225, 8 S.Ct. 495, 31 L.Ed. 411], between the effect of a judgment, as a final and conclusive determination of the rights of the parties, when it is set up in a second action resting on the same claim or demand on which the first was founded, and its effect when it is set up in a subsequent litigation between the same parties, founded upon a different claim or cause of action. In the first, where the second suit is based upon the same claim or demand involved in the first, the judgment in the first must be treated as a finality, `concluding,' in the language of Mr. Justice Field, in Cromwell v. Sac County, supra (94 U.S. [4 Otto] at page 352), `parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'
See also Allesandra v. Gross, supra, 187 N.J. Super. at 103-104.
In the present case the claim of the arbitrating homeowners was that the windows and doors in their homes were defective. This was all they were required to show in order to prevail at the arbitration hearing and to compel CMG to correct the defects or to pay the costs of repair or replacement of the windows and doors. They were not required to show whether the defects resulted from flaws in their design or manufacture or from the negligence of CMG in their installation. Nor was there any need for the homeowners to show that CMG had made any representation concerning the quality of the windows and doors. Consequently, the claims which the arbitrating subclass attempted to pursue at trial were essentially the same *636 claims which they arbitrated, and those claims are directed against the same party, CMG.
Furthermore, the fact that damages resulting from a violation of the Consumer Fraud Act are trebled does not mean that such a claim must be considered to be independent for purposes of res judicata. As observed in the comment to the Restatement of Judgments:
The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split. [Restatement, Judgments 2d, § 24 at 197 (1982)].
We also note that since arbitration under the home warranty agreement was not binding, plaintiffs could have simply rejected the arbitration award and litigated their entire claim if they were dissatisfied with the result of the arbitration, including the unavailability of treble damages. Accordingly, we are satisfied that the trial judge correctly determined that the arbitrating subclass was foreclosed by principles of res judicata from pursuing any claim based upon the alleged defects in their windows and doors.
This result is supported by policy considerations favoring the finality of arbitration awards. As the Court observed in Barcon Associates v. Tri-County Asphalt Corp., 86 N.J. 179, 187 (1981):
Arbitration is "a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law," and its object is "the final disposition, in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between the parties." Arbitration can attain its goal of providing final, speedy and inexpensive settlement of disputes only if judicial interference with the process is minimized; it is, after all, "meant to be a substitute for and not a springboard for litigation." [Citations omitted].
Surely, arbitration will not provide a "final disposition" of homeowner warranty claims but rather only a "springboard for litigation" if warranty claims which have been fully arbitrated can be subsequently litigated simply by the device of a homeowner *637 relabeling his claim as one for negligence or consumer fraud.
The result we reach is also supported by a line of authority in the federal courts. See, e.g., City of Gainesville v. Island Creek, 618 F. Supp. 513 (D.Fla. 1984), aff'd o.b. 771 F.2d 1495 (11th Cir.1985); Schattner v. Girard Inc., 668 F.2d 1366 (D.C. Cir.1981); Goldstein v. Doft, 236 F. Supp. 730 (S.D.N.Y. 1964), aff'd 353 F.2d 484 (2nd Cir.1965), cert. den. 383 U.S. 960, 86 S.Ct. 1226, 16 L.Ed.2d 302 (1966). For example, in Goldstein v. Doft, the court rejected an attempt to litigate a claim previously rejected by arbitrators simply by presenting new theories of liability. The court stated:
The next expedient focuses upon the difference in the theories upon which relief is sought in this action and those pursued in the arbitration proceeding. Plaintiff contends he there sought only "commissions due," while here he seeks damages for misrepresentation, inducement of breach of contract and unjust enrichment  that his present complaint sounds in tort. But a shift in legal theories or a new or different ground for relief sought does not of itself work magic and dissolve the defense of res judicata. [236 F. Supp. at 734].
Similarly, in Schattner v. Girard, Inc., supra, the parties to a licensing agreement arbitrated claims and counterclaims of breach of contract, fraud and misrepresentation. In an action to confirm the arbitration award, one party made additional claims based on allegations of unfair competition, conversion and interference with contractual relations. However, the court concluded that these new claims were barred by the arbitration award under principles of res judicata:
A party whose claims have been decided in arbitration may not then bring the same claims under new labels.... The same is true of claims that should have been submitted to arbitration, even if they were not actually heard, for any other rule would allow parties to split their causes of action. [668 F.2d at 1368; citations omitted].
In concluding that the arbitrating subclass is foreclosed from seeking an additional recovery against CMG under alternative theories of liability, we emphasize that the members of this subclass voluntarily participated in the arbitration proceeding, accepted the arbitration award and failed to take any steps to *638 repudiate the award until trial.[6] Under these circumstances, we are satisfied that there is nothing fundamentally unfair or inconsistent with public policy in applying principles of res judicata to bar the arbitrating subclass from litigating any claims against CMG relating to alleged defects in their windows and doors.

III
At the close of all evidence the trial judge entered a directed verdict against CMG on the consumer fraud count of the complaint. This directed verdict was based solely on a sales brochure distributed to prospective purchasers which states that the homes sold by CMG include "insulated aluminum windows."
It is well established that a motion for a directed verdict should be denied "... if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ." Dolson v. Anastasia, 55 N.J. 2, 5 (1969). Evaluating the proofs in the present case by this standard, we conclude that plaintiffs' claims under the Consumer Fraud Act presented factual issues which should have been decided by the jury.
In holding that the brochure distributed by CMG violated the Consumer Fraud Act as a matter of law and directing a verdict in favor of plaintiffs, the trial judge stated:
... the Court concludes that as a matter of law, there was consumer fraud in that there was deception, in that there was an unconscionable commercial practice.
As to the description of these windows as insulated, I think the most logical thing to assume, when we're talking about an insulated window, is not the *639 insulated glass. We're talking about a window as a window, not a component in [sic] part thereof.
* * * * * * * *
... If you're going to use a term insulated window in your advertising, I think the public's reasonable expectation that the window unit as a window unit, and not just the glass, will have some thermal quality, some ability, to some extent, by reason of insulation, to limit the inflow or limit the transference of cold from the outside in, or if you have an air conditioned home in the summer, either the heat in or the cold out, depending on your point of view.
The prohibitions against the employment of any "unconscionable commercial practice" or "deception," which the trial judge found CMG's brochure to have violated, as well as the other practices declared unlawful by N.J.S.A. 56:8-2, are not defined anywhere in the Consumer Fraud Act. Hence, there is frequently room for debate whether particular commercial practices violate the Act. For this reason, the Division of Consumer Affairs has made active use of its rule making power to prohibit particular commercial practices, see N.J.A.C. 13:45A-1.1 to N.J.A.C. 13:45A-16.2, and our courts have liberally construed the Act in upholding the Division's rules and regulations. See, e.g., Fenwick v. Kay American Jeep, Inc., 72 N.J. 372 (1977); State v. Hudson Furniture Co., 165 N.J. Super. 516 (App.Div. 1979); Pet Dealers Ass'n v. Div. of Consumer Affairs, 149 N.J. Super. 235 (App.Div. 1977), certif. den. 75 N.J. 16, (1977). But when an advertisement is not covered by a specific rule or regulation, it must be determined through adjudication "whether the ad itself is misleading to the average consumer." Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69 (1985); see also Kugler v. Romain, 58 N.J. 522 (1971); D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 25-32 (App.Div. 1985). Although there may be some circumstances in which an advertisement is so patently deceptive that a violation of the Consumer Fraud Act may be found as a matter of law, the determination whether an advertisement is misleading is ordinarily for the trier of fact  here the jury  to decide. Indeed, a jury would appear especially well suited to determine the impact of an advertisement upon "an average consumer."
In this case it was undisputed that the windows installed in the homes sold to plaintiffs have a double pane of glass which *640 provides insulation. It was also undisputed that the aluminum frames of the windows have no insulating features. The factual issue which should have been submitted to the jury was whether the average consumer would understand the term "insulated aluminum windows" to refer only to the glass or to the entire window unit.
The testimony on this issue was conflicting. Some plaintiffs testified that they understood the term "insulated aluminum windows" to refer to the entire window unit. Moreover, plaintiffs' experts testified that it was misleading to describe the windows installed in plaintiffs' homes as "insulated" because only the glass was insulated. According to these experts, only a window unit with a "thermal break" in the frame could be properly described as insulated. On the other hand, the manufacturer's representative who sold the window to CMG characterized it as "a regular insulated glass window." Moreover, the manufacturer's literature referred to the window as "a truly remarkable insulated single hinge removable sash window."
Furthermore, the jury was not bound by such opinion testimony even if it had not been conflicting. See County of Middlesex v. Clearwater Village, Inc., 163 N.J. Super. 166, 174 (App.Div. 1978), certif. den. 79 N.J. 483 (1979). Rather, it was within the province of the jury to reach its own conclusion whether use of the term "insulated aluminum windows" to describe the windows installed by CMG would be "misleading to the average consumer." Therefore, the directed verdict in favor of plaintiffs on their consumer fraud claims must be reversed.[7]

IV
On their cross-appeal plaintiffs argue that the trial judge erred in not submitting to the jury the consumer fraud claims *641 of (1) purchasers who relied solely on oral representations by CMG and (2) subsequent purchasers who did not deal directly with CMG.
After a directed verdict was granted in favor of the homeowners who relied upon CMG's brochure, both counsel and the trial judge appeared to forget about the consumer fraud claims of plaintiffs who did not rely upon the brochure. Consequently, the consumer fraud claims of these plaintiffs were not decided by the trial judge as a matter of law or submitted to the jury. However, our review of the record shows that oral representations substantially similar in content to CMG's brochure were allegedly made to two homeowners, Michelle Pecikonis and Frank Puccio.[8] Oral misrepresentations are covered by the Consumer Fraud Act to the same extent as written misrepresentations. See Hyland v. Zuback, 146 N.J. Super. 407 (App.Div. 1976). Therefore, the consumer fraud claims of Pecikonis and Puccio should have been submitted to the jury. Since there must be a retrial of plaintiffs' consumer fraud claims in any event, we conclude that the retrial should include the claims of the two plaintiffs to whom oral misrepresentations allegedly were made.
Plaintiffs' argument that subsequent purchasers of homes should have been permitted to recover consumer fraud damages, even though they never received either the brochure or any oral representation from CMG concerning the windows, is clearly lacking in merit. There is no basis for finding a violation of the Consumer Fraud Act with respect to these purchasers because CMG made no representation to them. Stated another way, these purchasers have not suffered "any ascertainable loss of moneys or property" as a result of CMG's use of a practice declared unlawful by the Consumer Fraud Act, and hence they have no claim under N.J.S.A. 56:8-19.

*642 V
The parties raise a number of other points which require brief discussion.
CMG seeks a new trial on the grounds that the financial interest of certain witnesses in the outcome of the case was not disclosed and that its opportunity to cross-examine plaintiffs' experts was improperly restricted. These arguments were rejected by the trial judge in an oral opinion rendered on February 1, 1985. We affirm the denial of a new trial on these grounds substantially for the reasons expressed by the trial judge. We also conclude that the admission into evidence of the "Limited Warranty Home Warranty Agreement" as evidence of performance standards was within the discretion of the trial judge and would not in any event be grounds for granting a new trial.
CMG argues that it should have received a credit against its liability for compensatory damages for the full amount of $200,000 paid by Capitol in settlement of plaintiffs' claims. The jury determined that the negligence attributable to CMG was 75% and the negligence attributable to Capitol was 25%. Accordingly, the trial judge reduced the amount of the jury verdict by 25% and entered judgment against CMG in the amount of $181,642.50. This calculation of CMG's liability for compensatory damages was fully consistent with the provisions of the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., as interpreted in Cartel Capitol Corp. v. Fireco of New Jersey, 81 N.J. 548, 569 (1980) and Rogers v. Spady, 147 N.J. Super. 274, 277-278 (App.Div. 1977). We also find no support in the record for CMG's argument that the parties intended that CMG be credited for the $200,000 paid by Capitol in a manner different from the provisions of the Comparative Negligence Act.
CMG further argues that the trial judge erred in not allowing any credit for the amount of the Capitol settlement in trebling damages pursuant to the Consumer Fraud Act. In calculating these damages the trial judge used the damages of $533 per window awarded by the jury on plaintiffs' negligence and *643 breach of warranty claims, multiplied that figure by the total number of windows in the homes of the purchasers awarded consumer fraud damages, and then doubled this figure. This resulted in additional damages of $156,702, referred to by the trial judge as "punitive damages" under the Consumer Fraud Act. CMG argues that the trial judge should have reduced the base figure of $533 per window by the 25% attributed to Capitol's negligence in calculating consumer fraud damages, which would have resulted in additional damages of $117,526.50.
This issue arises because the trial judge did not ask the jury to separately determine the amount of damages resulting from CMG's violation of the Consumer Fraud Act but rather simply used the jury's damage award for negligence and breach of warranty. We are unable to determine whether this approach to the calculation of consumer fraud damages was based upon an agreement made between counsel off the record or was the result of a ruling by the trial judge. Therefore, we direct the trial judge upon remand to address this subject at a pretrial conference. It should be determined whether there was a binding stipulation concerning the manner in which consumer fraud damages would be calculated. If so, it should be further determined whether it is appropriate under all the circumstances to enforce that stipulation at the retrial. If there is no binding stipulation concerning the calculation of consumer fraud damages, we direct the attention of counsel and the trial judge to the discussion of this subject in Ramanadham v. N.J. Mfrs. Ins. Co., 188 N.J. Super. 30, 33 (App.Div. 1982) (the jury should separately determine the damages proximately caused by a violation of the Consumer Fraud Act in a case in which plaintiffs are proceeding upon multiple theories of liability); see also Hundred East Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 358-362 (App.Div. 1986). Pending the determination of these issues upon remand, we consider it inappropriate to decide whether CMG may be entitled to some form of credit against consumer fraud damages for the amount of plaintiffs' settlement with Capitol.
*644 Finally, we find no abuse of discretion in the denial of prejudgment interest. In its verdict the jury specifically indicated that damages awarded plaintiffs  which were based upon expert testimony concerning the 1981 cost of replacement of the defective windows and doors  included a 5% annual increase for the years 1982, 1983, 1984. In colloquy with the trial judge, the jury foreperson indicated that the purpose of this adjustment was to fix the costs of replacement of the windows and doors as of 1984, when the case was tried.[9] The trial judge reasonably concluded that under these circumstances plaintiffs would receive a windfall if they were also awarded prejudgment interest. Hence, he properly exercised his authority pursuant to R. 4:42-11(b) to "suspend" prejudgment interest "in exceptional cases." See Dall'Ava v. H.W. Porter Co., 199 N.J. Super. 127 (App.Div. 1985).
For the foregoing reasons we affirm the part of the final judgment awarding plaintiffs $181,642.50 in compensatory damages. We reverse the part of the judgment awarding plaintiffs an additional $285,947.19 in damages pursuant to the Consumer Fraud Act and we remand this part of the case for a new trial in conformity with this opinion.
NOTES
[1] This pretrial ruling (as well as several others) was apparently never formalized by an order.
[2] The liability of Capitol was submitted to the jury solely on the basis of negligence and not principles of strict liability in tort.
[3] An agreement was reached among plaintiffs, including the arbitrating subclass, to share any recovery in the litigation. Therefore, all damages were awarded as lump sums rather than being separately allocated to individual plaintiffs or groups of plaintiffs.
[4] The notice of appeal, which was filed on March 12, 1985, was taken from the "final judgment" of $181,642.50 for compensatory damages entered on December 20, 1984. The December 20, 1984 order does not appear to be a final judgment, since it contains no certification pursuant to R. 4:42-2 that there is "no just reason for delay" in the entry of a "final judgment" upon less than all claims. Furthermore, when a final judgment which included the damages on plaintiffs' consumer fraud claims was entered on April 15, 1985, no notice of appeal or amended notice of appeal was filed. Consequently, the notice of appeal was filed prematurely and did not indicate an intention to appeal from all parts of the final judgment now challenged by CMG. However, plaintiffs have not argued that we should dismiss the appeal or limit its scope on these grounds. Indeed, their own notice of cross-appeal also was filed prematurely on March 25, 1985. Therefore, we have determined to consider all issues raised by the parties on their merits.
[5] One possible explanation for this strategy is that the arbitrating plaintiffs may have contemplated retaining the benefits of the arbitration award against CMG and also seeking an additional recovery against third-party defendant, Capitol, through litigation. If this was the strategy, it was in part successful since a $200,000 settlement was entered into with Capitol.
[6] These circumstances are among the distinctions between this case and Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) and Thornton v. Potamkin Chevrolet, 94 N.J. 1 (1983), in which employees were permitted to litigate statutory civil rights claims subsequent to labor arbitrations in which their claims had been rejected.
[7] We note that various plaintiffs testified that CMG's representatives made numerous deceptive oral representations concerning the quality of the windows which went beyond simply describing them as "insulated." Plaintiffs may of course again present this evidence at the retrial to support their consumer fraud claims.
[8] Plaintiff's brief states that two other purchasers, Orlando Martino and Ann Diamond, also did not rely upon the written brochure. However, our own review of the record indicates that these purchasers relied upon the written brochure as well as alleged oral representations. Thus, consumer fraud damages should have been awarded these plaintiffs even under the trial judge's disposition of the consumer fraud claims.
[9] The trial court instructed the jury that they should determine the date as of which to award damages. Neither party challenges this part of the instructions to the jury.