243 N.J. Super. 590 (1990)
581 A.2d 91
WAYNE E. CHATTIN, ET UX; FRANK J. INGARGIOLA, ET UX; JOSEPH J. MARTELLA, ET UX; ANTHONY BUCCAFERNI AND PATRICK SMITH, ON BEHALF OF THEMSELVES AND ON BEHALF OF A CLASS OF HOMEOWNERS, PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,
v.
CAPE MAY GREENE, INC., A NEW JERSEY CORPORATION, DEFENDANT-APPELLANT-CROSS-RESPONDENT, AND CAPITOL PRODUCTS CORPORATION, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1989.
Decided September 24, 1990.
*594 Before Judges BRODY, MUIR, Jr. and SKILLMAN.
Frederick J. Dennehy argued the cause for appellant-cross-respondent (Wilentz, Goldman & Spitzer, attorneys; Lisa Adubato Nesi, Dakar Rahim Ross and Frederick J. Dennehy, on the brief).
Thomas J. Vesper argued the cause for respondents-cross-appellants (McAllister, Westmoreland, Vesper & Schwartz, attorneys; Emily H. Armstrong and Thomas J. Vesper, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
This suit by a group of homeowners against the developer from which they purchased their homes is before us for the second time. See Chattin v. Cape May Greene, Inc., 216 *595 N.J. Super. 618, 524 A.2d 841 (App.Div. 1987), certif. den. 107 N.J. 148, 526 A.2d 209 (1987). The development, which is located in Ventnor and is known as Kings Bay West, was constructed by defendant Cape May Greene, Inc. (CMG). The windows in the development, manufactured by defendant Capitol Products Corporation (Capitol), consist of a double pane of glass set into a hollow aluminum frame. The double pane of glass has substantial insulating qualities but the frame has none. CMG described the homes in a written brochure and in oral representations to prospective purchasers as having "insulated windows." The uncontradicted evidence at trial was that a window with a double pane of glass and an uninsulated frame was referred to in the construction and window industries as an "insulated window." However, the homeowners all testified that they understood this term to mean that the entire window including the frame was insulated. There was substantial evidence presented at the retrial, as in the original trial, that the homeowners experienced significant problems with the windows, including condensation on the inside and drafty conditions in the homes.
In our original opinion we affirmed the part of a final judgment awarding the homeowners $181,642.50 in compensatory damages based on a jury's determination that CMG was negligent and breached warranties to the homeowners by installing defective windows and doors. However, we reversed the part of the final judgment awarding an additional $285,947.19 in damages based on a directed verdict entered in favor of the homeowners on their claims under the Consumer Fraud Act. Consequently, we remanded for a retrial on the homeowners' consumer fraud claims.
At the retrial, the jury determined that CMG had violated the Consumer Fraud Act, thereby causing the affected homeowners *596 to incur damages of $550 for each window in their homes.[1] The trial court molded this verdict by multiplying the total number of windows in the homes by $550, trebling this amount and deducting the compensatory damages for negligence and breach of warranty awarded in the first trial, resulting in a net award of $184,305. In addition, the court awarded the homeowners $502,469.62 in attorneys' fees and $44,610.49 in costs and thus entered a final judgment of $731,385.11 in their favor.
CMG appeals from the judgment, contending that (1) the trial court incorrectly instructed the jury as to the elements of a claim under the Consumer Fraud Act, (2) the trial court erred in allowing the jury to award replacement costs as damages for consumer fraud, (3) the trial court erred in refusing to submit to the jury the issue of codefendant Capitol's liability for consumer fraud, thereby depriving the jury of the opportunity to apportion consumer fraud damages as between CMG and Capitol, (4) the trial court erred in submitting to the jury the consumer fraud claims of six homeowners, (5) the trial court committed various errors in the conduct of the trial which were so prejudicial that a new trial on all issues must be conducted, and (6) the trial court awarded excessive attorneys' fees to the homeowners. The homeowners cross appeal, contending that (1) the trial court erred in submitting the consumer fraud claims of only sixteen rather than twenty-four homeowners to the jury, and (2) the trial court erred in denying their motion to enforce a 1978 arbitration award against CMG.
We conclude that the trial court incorrectly instructed the jury as to the elements of a claim under the Consumer Fraud Act. However, the court properly submitted the issue of damages to the jury. Therefore, the case is remanded for a retrial limited to the issue of liability. We further conclude that the trial court erred in various respects in determining the award of *597 attorneys' fees. Consequently, if the jury on remand again returns a verdict in favor of the homeowners, the court must redetermine the award of attorneys' fees in accordance with the guidelines set forth in this opinion. Finally, we conclude that the trial court erred in refusing to enforce the 1978 arbitration award against CMG and that a judgment in the amount of that award should therefore be entered immediately.

I
CMG argues that the jury verdict must be reversed because the trial court permitted the jury to impose liability for consumer fraud without any showing that CMG intended to mislead the purchasers of homes in Kings Bay West.
In reversing the trial court's order granting a directed verdict in favor of the homeowners on their consumer fraud claims, we stated in our first opinion that:
[T]he determination whether an advertisement is misleading is ordinarily for the trier of fact  here the jury  to decide....
In this case it was undisputed that the windows installed in the homes sold to plaintiffs have a double pane of glass which provides insulation. It was also undisputed that the aluminum frames of the windows have no insulating features. The factual issue which should have been submitted to the jury was whether the average consumer would understand the term "insulated aluminum windows" to refer only to the glass or to the entire window unit. [216 N.J. Super. at 639-640, 524 A.2d 841].
But since the trial court failed to submit the homeowners' consumer fraud claims to the jury in the first trial, we had no occasion in our first opinion to consider the appropriate form of jury instructions.
N.J.S.A. 56:8-2 states in pertinent part:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; ...
*598 N.J.S.A. 56:8-2 thus creates two categories of prohibited acts. The first category (unconscionable commercial practice, deception, fraud, false pretense, false promise or misrepresentation) consists of affirmative acts, and the second category (concealment, suppression or omission of any material fact) consists of acts of omission. The Supreme Court indicated in Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 378, 371 A.2d 13 (1977) that those kinds of consumer fraud consisting of affirmative acts do not require a showing of "intent":
The capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice. Intent is not an essential element.
See also D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 22, 501 A.2d 990 (App.Div. 1985). However, by the express terms of N.J.S.A. 56:8-2, an essential element of a consumer fraud consisting of an act of omission is that a defendant's act be "knowing." See Fenwick v. Kay American Jeep, Inc., supra, 72 N.J. at 377, 371 A.2d 13 ("[T]he requirement that knowledge and intent be shown is limited to the concealment, suppression or omission of any material fact").
Therefore, where a defendant's alleged consumer fraud may be viewed as either an affirmative act or an omission, the court must clearly inform the jury that it can hold defendant liable without a finding of intentional wrongdoing only if it finds that defendant committed a kind of consumer fraud consisting of an affirmative act.[2] Moreover, the court must clearly explain to the jury the difference between the kinds of consumer fraud consisting of affirmative acts, which may be committed without a showing of intent, and acts of omission, which must be *599 committed "knowingly" in order for liability to be imposed under the Consumer Fraud Act.[3]
The trial court's jury instructions in this case failed to satisfy these requirements. The court described the elements of a cause of action for consumer fraud under N.J.S.A. 56:8-2 as follows:
I said I was going to define the concept of consumer fraud to you, and here goes. The so-called consumer fraud remedy arises out of an act of our legislature, and that act provides in its pertinent part ... consumer fraud is the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact, with intent that others rely upon such concealment, suppression, or omission in connection with the sale or advertisement of, and in this case, real estate.
Our courts have determined that this is a remedial act and should be liberally construed in favor of protecting consumers. I will advise you, as well, that with regard to this statute there has been no specific regulations developed implementing it, nor I think beyond this particular case, which aspects of it are reported, there is no other case law on it.
With regard to consumer fraud in our present context, the capacity to mislead is the prime ingredient of deception or unconscionable commercial practice. Intent is not an essential element with regard to the misleading, it is, as you heard from the statute, as to a portion of it. I will get into that later. But since consumer protection is the ultimate goal, the standard of conduct established by the act must be met regardless of intent, except when the act specifically requires there to be intent.
The standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact, and fair dealing. In the context of the selling to the uneducated, the inexperienced, people of low incomes, by a professional seller, a material departure from the unconscionable standard puts a badge of fraud on the transaction, and in such a case then the concepts of fraud and unconscionability would be interchangeable.
With respect to misrepresentation, misrepresentation means to represent incorrectly or improperly, to give a false, improper, or imperfect representation. Now, in this context I use imperfect not to require perfection of a human being, but imperfect in the sense it is missing a necessary element or ingredient, like if you bought a product and it was missing a piece, in that sense, imperfect.
As well, misrepresentation has been defined as an untrue, incorrect, or misleading representation of fact, a representation that under the existing *600 circumstances amounts to an assertion not in accordance with the facts. So this is what is meant by misrepresentation. So we are dealing with unconscionability, misrepresentation. A violation of the act is also established if there is any knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission.
There is a third alternative theory advanced, and this is the one where there has to be knowledge, there has to be intent on this one. Here proof of intent, as I said, is required. Now, a corporation can act only through its agents and employees, and it is responsible for their conduct in the course of their agency or employment. And a corporation is chargeable with the knowledge of its employees who act in a managerial or supervisory capacity.
Thus, to recapitulate on the issue of consumer fraud, there are certain essential elements which have to be established by the respective claimants by a preponderance or greater weight of the credible evidence. And the elements of this cause of action are that the defendant represented to the plaintiff in question either orally or through a brochure, or indeed through both, that the windows being sold were insulated windows. Some of the oral representations alleged in this case may have been different, but it is your recollection of what the testimony was which will govern.
So, first, that there was either a written or oral representation as to the insulated nature of the windows. Secondly, that each individual plaintiff, or as the case may be plaintiff couples, heard and/or read the representation regarding the windows. Thirdly, that this representation was false, or it had the capacity to mislead an average consumer into believing that he was getting something other than that which in fact the consumer purchased, or, indeed, as I said, with the knowing concealment, suppression, or omission of a material fact with the intention that the home buyer rely on that concealment, suppression, or omission in connection with the purchase of his or her home. And, finally, that the representation in question was a proximate cause of an ascertainable loss to the plaintiffs.
This instruction is confusing in structure and fails to explain the difference between the kinds of consumer fraud which require "knowing" action and those which may be established without any showing of scienter. In fact, the court's statement that the term "misrepresentation" includes an "imperfect representation ... in the sense it is missing a necessary element or ingredient" completely blurs the distinction between an affirmative act of misrepresentation and a "concealment, suppression or omission of any material fact." Moreover, beyond reciting the language of the statute, the court never described to the jury the kind of consumer fraud which must be "knowing." Therefore, the jury may have held CMG liable under the mistaken *601 impression that the unknowing omission of a material fact constitutes consumer fraud.
The confusion caused by the court's failure to adequately describe the kinds of consumer fraud which do not require a showing of intent was compounded by its discussion of "unconscionable commercial practice." The court stated that "[i]n the context of the selling to the uneducated, the inexperienced, people of low incomes, by a professional seller, a material departure from the unconscionable standard puts a badge of fraud on the transaction, and in such a case then the concepts of fraud and unconscionability would be interchangeable." This general statement of law was not in any way related to the facts of this case and undoubtedly only increased the jury's confusion.
In fact, a court should be hesitant to make any reference to the general concept of an "unconscionable commercial practice" in a case such as this, where there is substantial evidence that defendant breached its warranties to plaintiffs, to avoid conveying the impression that plaintiffs are entitled to prevail on their consumer fraud claims even though defendant's advertising has not been shown to contain misrepresentations or omissions of material facts. We have held that a breach of warranty is not an unconscionable commercial practice unless plaintiffs establish the presence of "substantial aggravating circumstances." D'Ercole Sales, Inc. v. Fruehauf Corp., supra, 206 N.J. Super. at 21-32, 501 A.2d 990; see also DiNicola v. Watchung Furniture, 232 N.J. Super. 69, 72-73, 556 A.2d 367 (App.Div. 1989), certif. den. 117 N.J. 126, 564 A.2d 854 (1989). Therefore, the trial court's statement to the jury that it could hold defendant liable under the Consumer Fraud Act for an "unconscionable commercial practice," without any explanation of the relevancy of this theory of liability to the specific facts of this case, could have led the jury to impose liability for consumer fraud based upon a simple breach of warranty.
*602 We disagree with our dissenting colleague's view that the deficiencies in the trial court's explanation of the requirements of consumer fraud were harmless error, because the jury's findings in response to special interrogatories that the "average consumer" would understand that the terms "insulated aluminum windows" and "insulated windows" to refer to the "entire window unit" rather than "only the glass" required a verdict in favor of the homeowners. The jury's responses to the special interrogatories indicate that it found CMG's brochure to be misleading. However, those responses do not indicate whether the jury found the brochure misleading because it contained an affirmative misstatement of fact or because it omitted a material fact. As we noted in In re Shack, 177 N.J. Super. 358, 363, 426 A.2d 1031 (App.Div. 1981), certif. den. 87 N.J. 352, 434 A.2d 95 (1981), "[a] failure to disclose material information may cause an advertisement to be false or deceptive even though it does not state false facts." Thus, the capacity to mislead is a common feature of both a misrepresentation of fact and an omission of a material fact. Consequently, the jury's verdict in favor of the homeowners could reflect a finding that CMG's representation that the windows were insulated was true, because the glass panes were insulated, but that it was misleading, because it omitted to state that the aluminum frames were uninsulated. It was within the province of the jury to find a violation of the Consumer Fraud Act on this basis, but only if it found that omission was made knowingly with the intent to deceive the purchasers. It was the need for this finding which the court failed to adequately explain to the jury. And the need for that finding was not obviated by the jury's responses to the court's interrogatories regarding the average consumer's understanding of the terms "insulated aluminum windows" and "insulated windows." Indeed, our conclusion that the jury was not adequately instructed concerning the elements of a consumer fraud violation is reinforced by the interrogatories, because it is quite possible that the jury, like our dissenting colleague, assumed that an affirmative response *603 to the interrogatories automatically required the imposition of liability upon CMG, without any finding that it either made an affirmative misrepresentation of fact or acted knowingly with an intent to deceive.
Moreover, this is not an appropriate case for a finding of harmless error. Although the plaintiff in a common law fraud action is required to show that the alleged tortfeasor acted knowingly, with an intent to deceive, in order to recover money damages, Jewish Center of Sussex County v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981), the Consumer Fraud Act, as construed in Fenwick, permits a finding of a violation of the Act, and the consequent imposition of treble damages and attorneys' fees, without any showing of an intent to deceive or even negligence on the part of a seller of consumer goods or services. However, the Legislature limited this significant departure from common law principles of liability to situations where sellers make affirmative misrepresentations of fact.[4] This limitation constitutes an important safeguard against the imposition of liability upon sellers of goods and services for the innocent failure to make a complete disclosure of facts material to a transaction. Therefore, it is imperative that the trial court clearly and fully explain this limitation to the jury. In our view, the court's instructions were seriously deficient in this regard and had the clear capacity to lead to a jury verdict imposing treble damages and attorneys' fees upon CMG for conduct which did not violate the Consumer Fraud Act.
Consequently, we conclude that the jury verdict in favor of the homeowners on their consumer fraud claims must be reversed *604 and the case retried. However, we further conclude for the reasons set forth in sections II and III of this opinion that the trial court properly submitted the issue of damages to the jury. And since the error in the court's instructions with respect to the determination of consumer fraud did not have the capacity to affect the jury's deliberations on the issue of damages, there will be no need at the retrial to resubmit any issue of damages to the jury.[5]

II
CMG argues that the trial court erred in allowing the jury to award replacement costs as damages for consumer fraud, because the jury at the first trial already awarded the same damages based on a finding of negligence.
In our prior opinion, we concluded that unless it was established that the parties had entered into an enforceable stipulation to calculate consumer fraud damages in a different manner, the jury should be asked at the retrial to separately determine the damages proximately caused by CMG's alleged violation of the Consumer Fraud Act. 216 N.J. Super. at 642-643, 524 A.2d 841.
The trial court instructed the jury as follows regarding its determination of damages proximately caused by any consumer fraud committed by CMG:
And what is the measure of damages? There are basically two approaches that can be taken in a so-called fraud or concealment case. One approach is the so-called out of pocket approach, the other is the benefit of the bargain rule. In either, the basic objective is to make the injured party whole; that is to say, fairly and reasonably compensate the injured party for the damages or losses proximately caused by the alleged consumer fraud in this case.
Under the out of pocket approach recovery would be permitted for the difference between the price paid and the actual value of the property acquired. Under the benefit of the bargain approach recovery is allowed for the difference *605 between the price paid and the value of the property had the representations made been true; that is to say, to put the person in the same position that person should have enjoyed had the representations been true. And, in any event, under either approach, you may use as a measure of this the reasonable cost of any repairs, or alterations, or modifications necessary to render the property to be as represented.
However, as I have indicated to you, anything that is done must be reasonable. We cannot allow waste to occur. The homeowners would have an obligation to act reasonably and to mitigate, that is, to lessen to the extent as reasonably possible their losses and damages. They are entitled to a comparable product without waste. As I said somewhat facetiously off the record to counsel, if you buy a Yugo you are not entitled to a limo, you are entitled to get what was represented to you, what is comparable to what is represented, but not more, and it is for you to evaluate the proofs in this particular regard.
We believe that this instruction correctly informed the jury that the award should be limited to what the homeowners would have received had CMG's representations regarding the windows been accurate and that they were to award the homeowners only those damages proximately caused by CMG's alleged consumer fraud. This instruction was thus consistent with N.J.S.A. 56:8-19 and Ramanadham v. New Jersey Manufacturers Ins. Co., 188 N.J. Super. 30, 32-33, 455 A.2d 1134 (App.Div. 1982). Moreover, the instruction properly informed the jury that they should award no more than was reasonably required to make the homeowners whole and thus conformed with the principles set forth in 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 254, 168 A.2d 33 (1961) and Correa v. Maggiore, 196 N.J. Super. 273, 284-285, 482 A.2d 192 (App.Div. 1984). It was clearly within the province of the jury to award the homeowners an amount of money representing not only the cost of windows that have fully insulated glass and frames but also the cost of removing the unsatisfactory windows and installing new ones.
Moreover, the court molded the verdict so as to eliminate any duplication between the jury award in the first trial for negligence and breach of warranty and the award in the second trial for consumer fraud. The judgment provided that:
Defendant, Cape May Greene, Inc. shall receive credit for $533.00 per window for the 165 windows represented in this (1988) verdict previously paid as a *606 result of the jury verdict on December 20, 1984 and a final judgment entered thereon dated April 10, 1985 to wit Eighty Seven Thousand Nine Hundred Forty Five Dollars ($87,945.00).
This damage calculation correctly applied the principles set forth in Neveroski v. Blair, 141 N.J. Super. 365, 381-382, 358 A.2d 473 (App.Div. 1976).

III
Next CMG argues that the trial court erred in refusing to submit codefendant Capitol's liability for consumer fraud to the jury, thereby depriving the jury of the opportunity to apportion consumer fraud damages between CMG and Capitol.[6]
The trial court correctly recognized that a manufacturer which makes representations about its product that are intended to be conveyed to the ultimate retail buyer may be held liable for consumer fraud. See Perth Amboy Iron Works, Inc. v. American Home Assurance Co., 226 N.J. Super. 200, 211, 543 A.2d 1020 (App.Div. 1988) aff'd o.b. 118 N.J. 249, 571 A.2d *607 294 (1990) (the Consumer Fraud Act encompasses "the acts of remote suppliers, including the suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer.").
However, the court concluded that there was no factual basis for submitting a consumer fraud claim against Capitol to the jury:
With regard to the source of the term insulated window or insulated aluminum window in the defendant's brochure, [an employee of CMG] was the one who prepared it. While certain inferences can be drawn, I think it is fairly speculative as to whether the Capitol Products' brochure was the source of that or not. In any event, the brochure was Cape May Greene's, it was not Capitol Products'.... And in any event, even if Capitol Products were the source of that particular language it was Cape May Greene who extended it to the homeowner. So that, standing alone, and in and of itself, would not constitute consumer fraud by Capitol Products.
What Capitol Products did was distribute a brochure, P-9, which, among other things, described it was insulated to a builder or to someone in the trade, and as well there was a cross section diagram and the like, you can see what it was you were getting. There was more context than just insulated window in that particular brochure. So that, standing alone, is insufficient.
Next we have testimony of the sales representatives these brochures, Capitol brochures, or photocopies thereof, were seen in and about the sales office and seen by some unspecified homeowners.... There is no testimony by any of the sixteen plaintiffs that they saw any Capitol literature.... I think any inference that they did would border on the impermissibly speculative under the circumstances of this case.
But receipt in and of itself is not sufficient, either. There must be receipt, reliance, and loss as a result thereof. And the reliance gets even more speculative, because there [are] express denials by all of the sixteen that there was any receipt or reliance on anything that Capitol Products said were provided.
So for the reason I think it is impermissibly speculative on a factual basis, I determine that the issue of comparative consumer fraud of Capitol Products should not be submitted to the jury.
We agree substantially for the reasons expressed by the trial court that the evidence presented at the retrial did not warrant submission of the issue of Capitol's liability for consumer fraud to the jury. The trial court correctly found that there was no evidence that any of the homeowners with consumer fraud claims had seen, read, or relied upon Capitol's brochure. The three witnesses who did testify that they had seen the brochure *608 were not "plaintiffs" in the sense that their claims were submitted to the jury at the second trial.
The trial court also properly rejected CMG's contention that, regardless of whether any plaintiffs relied upon Capitol's brochure, Capitol could still be subject to Consumer Fraud Act liability because Capitol had originated the phrase "insulated window." Capitol's brochure contained a drawing that quite clearly indicated that the frame of its 850 window consisted of hollow aluminum. Further, Capitol's brochure indicated that a storm sash for the window was available at additional cost, thereby negating any suggestion that its window eliminated the need for separate storm windows. Thus, CMG's out-of-context use of Capitol's term, "insulated window," rendered that term no longer Capitol's statement. The Legislature could not have intended to impose Consumer Fraud liability upon a party whose statement is not misleading in context but is rendered misleading when taken out of context.

IV
CMG also argues that the consumer fraud claims of six of the homeowners should not have been submitted to the jury.
First, CMG argues that there was no evidence that five of the homeowners relied upon the brochure and thus their claims should not have been submitted to the jury. We have carefully reviewed the testimony of these homeowners and are satisfied that while their testimony may have been equivocal in some respects, each one indicated that he or she relied upon the alleged misrepresentations in CMG's brochure in purchasing their homes.
Second, CMG argues that an order entered by the trial court on November 30, 1987, which limited the homeowner witnesses on remand "to those thirteen homeowners who allegedly relied on Cape May Greene's brochure together with Michele Pecikonis and Frank Puccio," was the "law of the case" *609 and not subject to reconsideration. However, a trial court has "the inherent power, to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders at any time prior to the entry of final judgment." Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257, 531 A.2d 1078 (App.Div. 1987). The revelation that there were in fact 14 homeowners who allegedly relied upon the reference in CMG's brochure to "insulated windows" and who testified at the first trial provided an adequate basis for the court to reconsider the limitation upon the number of homeowners with provable consumer fraud claims contained in its November 30, 1987 order.

V
Next CMG argues that the trial court committed various errors in the conduct of the trial which were so prejudicial that a new trial on all issues must be conducted. These arguments are clearly without merit and do not require extended discussion. R. 2:11-3(e)(1)(E). The trial court's reprimands of CMG's counsel were relatively mild and, considered in the context of the entire trial, could not have had any substantial impact upon the jury. The court did not abuse its discretion in denying CMG's motion to disqualify the homeowners' counsel, because CMG unduly delayed raising the issue until shortly before the retrial, even though it was aware of the facts relevant to the alleged conflict for several years. Cf. Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 219, 536 A.2d 243 (1988) ("an order disqualifying counsel on the eve of trial would do more to erode the confidence of the public in the legal profession and the judicial process than would an order allowing the firm to continue its representation of plaintiff."). The court also did not abuse its discretion in allowing the homeowners to present testimony by non-plaintiff homeowners in Kings Bay West regarding the conditions caused by CMG's windows and the failure of any remedial steps short of replacement of the windows to correct those conditions.

*610 VI
CMG argues that the $547,080.11 in attorneys fees and costs awarded to the homeowners by the trial court is excessive. Since we have determined that the consumer fraud judgment against CMG must be reversed, the appeal could be decided without our passing upon the reasonableness of the award of attorneys' fees. However, in order to facilitate the proceedings on remand in the event a jury again finds CMG liable for consumer fraud, we have decided to address CMG's arguments relating to the attorneys' fee award.
The Consumer Fraud Act provides that successful plaintiffs shall be awarded "reasonable attorneys' fees" and "reasonable costs of suit." N.J.S.A. 56:8-19. The purpose of this fee-shifting provision is to ensure that "plaintiffs with bona fide claims are able to find lawyers to represent them." Coleman v. Fiore Bros., Inc., 113 N.J. 594, 598, 552 A.2d 141 (1989).
There are no decisions in this state which address the determination of "reasonable attorneys' fees" under N.J.S.A. 56:8-19. However N.J.S.A. 56:8-19 has essentially the same purpose as the federal Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988, which has generated a substantial body of case law. Therefore, the cases decided under that statute and other similar federal fee-shifting statutes provide guidance in determining the amount of "reasonable attorneys' fees."
The seminal decision of the Supreme Court of the United States articulating the standards for the determination of a reasonable fee under § 1988 is Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), in which the Court stated that:
The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services.
The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S Rep No. 94-1011, p 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. *611 Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. [461 U.S. at 433-434, 103 S.Ct. at 1939-1940, 76 L.Ed.2d at 50-51].
The Court has refined the standards for fee awards expressed in Hensley in more recent opinions interpreting the civil rights act as well as other fee-shifting statutes. See, e.g., Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), upon reargument 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). Thus, in its first opinion in Pennsylvania v. Delaware Valley Citizens' Council, supra, the Court stated:
Although upward adjustments of the lodestar figure are still permissible, such modifications are proper only in certain "rare" and "exceptional" cases, supported by both "specific evidence" on the record and detailed findings by the lower courts.
A strong presumption that the lodestar figure  the product of reasonable hours times a reasonable rate  represents a "reasonable" fee is wholly consistent with the rationale behind the usual fee-shifting statute, including the one in the present case. These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client.
* * * * * * * *
In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance. [478 U.S. at 565-566, 106 S.Ct. at 3098, 92 L.Ed.2d at 456-457; citations omitted].
In Singer v. State, 95 N.J. 487, 472 A.2d 138 (1984), cert. den. 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984), the Supreme Court of New Jersey considered the standard for determining an award of "reasonable" attorneys fees in regard to an application under § 1988, stating that:
The most useful starting point for determining the amount of a reasonable fee, noted by the Supreme Court itself, Hensley v. Eckerhart, supra, [461 U.S. at 433, 103 S.Ct. at 1939], is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This arithmetic result or "lodestar" may then be adjusted upward or downward to reflect any of those *612 factors articulated in Johnson v. Georgia Highway Express, Inc., [488 F.2d 714 (5th Cir.1974)] and any other considerations that are deemed relevant by the court in the exercise of its sound discretion in light of the objectives of the Awards Act.
In the present case, the trial court explained its reasons for granting the homeowners' application for attorneys' fees in its entirety, plus a 25% increase of that amount, in a written opinion dated May 23, 1988, which states in pertinent part:
I have reviewed the affidavits and the various submissions. I accept as correct the calculations which have been made, the items which have been deleted and the percentage allocation as made to the actual hours worked. I award a counsel fee in the amount of $401,975.75.
I next turn to the issue of whether it is an appropriate exercise of judicial discretion to apply a so-called "lodestar" to that amount. Various case law cited in plaintiff's moving papers in the matter returnable before me on March 31, 1988, persuades me that the court has both the discretion to award such a lodestar and that the factors to be considered persuade the court that such an award is appropriate. For reasons which follow, I apply a twenty five percent "lodestar."
Counsel for plaintiff initially undertook what appeared to be a complex matter. In the course of thorough preparation the matter of necessity became yet more complex. There was the expenditure of substantial time an [sic] effort with no guarantee whatsoever that counsel's extensive labors would be rewarded. As well, there is a clear public policy underlying the consumer fraud act to seek to deter consumer fraud and as well to encourage attorneys in appropriate cases to undertake representation of plaintiffs.
The quality of services and the quantity of services in this case were both extraordinary of necessity. This was a difficult case to which it was necessary to devote substantial office resources in order to properly prepare and prosecute it. The litigation has continued for approximately ten years and has thus been protracted as well as difficult.
The court necessarily has concern with the amount of the fee in relationship to the dollars recovered on plaintiff's behalf. Pursuant to Wisser v. Kaufman Carpet Co., 188 N.J. Super. 574 [458 A.2d 119] (App.Div. 1983) an appropriate attorney's fee may be awarded under the consumer fraud act without regard to the amount actually involved in the underlying dispute. As well as vigorously prosecuted, this case was vigorously defended. There was essentially no offer ever on the table with respect to the consumer fraud claim. The defendant is entitled to vigorously defend a case and to refuse to pay what it believes to be unjustified. However, where there is a vigorous defense, defense cannot be heard to complain where that vigor is met with vigor on the part of plaintiff's counsel. Plaintiff's and their attorneys were faced with a choice of either walking away from their claim or pursuing it. Plaintiff's counsel pursued the matter in a fashion consistent with their obligations as advocates.

*613 Thus I award counsel fees of $401,975.70 together with a 25 percent lodestar of $100,493.92 for a total counsel fee of $502,469.62.
We conclude that the trial court's opinion does not reflect adequate consideration of the factors pertinent to a determination of the reasonableness of an application for attorneys' fees. In addition, we conclude from our own review of the fee application that the "lodestar" figure itself was excessive and, a fortiori, there was no justification for any upward adjustment of that figure.[7]
We reach these conclusions for a number of reasons. First, the trial court did not provide an adequate justification for awarding the homeowners 40% of all attorneys' fees charged through the conclusion of the first trial. This part of the award was apparently based upon an affidavit of the homeowners' counsel dated March 21, 1985, which stated:
12. It is impossible to assess with any accuracy what amount of total time was spent for Cape May Greene issues as destinct [sic] from Capitol Product issues. The reason is that for the most part the defenses of Cape May Greene and Capitol Products were so clearly intertwined.
13. From my review of the twenty-seven (27) boxes of information that constitute this case file, I believe a fair assessment of work and effort were involved in the following proportions: 60% of my firm's total time prior to trial spent in litigation against Capitol Products and 40% of my firm's total time prior to trial against Defendant Cape May Greene.

*614 14. Of course, after the first day of trial, the efforts against Capitol Products were 0%; and 100% of my firm's effort and time was spent litigating with Cape May Greene.
This attempted allocation of the time spent on claims against CMG and Capitol is conclusionary, lacking in any supporting detail. Furthermore, it incorrectly assumes that the homeowners' are entitled to an award of attorneys' fees for all time expended in pursuing claims against CMG. However, at the first trial the homeowners pursued claims of not only consumer fraud but also negligence and breach of warranty, for which they were not entitled to any award of counsel fees. Indeed, the claims for breach of warranty and negligence were the only ones on which the homeowners succeeded in the first trial. Although this circumstance does not completely preclude an award of attorneys' fees for services performed in connection with the first trial, it should have been taken into account in determining a "reasonable" award for those services. See Hensley v. Eckerhart, supra, 461 U.S. at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52; Singer v. State, supra, 95 N.J. at 499-500, 472 A.2d 138; Westfield Centre Service, Inc. v. Cities Service Oil Co., 172 N.J. Super. 196, 411 A.2d 714 (App.Div. 1980), aff'd 86 N.J. 453, 432 A.2d 48 (1981).
Second, the trial court erred in awarding counsel fees for the services performed in the first appeal. "Applications relative to costs and allowances of counsel fees are to be made in the court in which the costs accrued or the services claimed for were rendered." Tooker v. Hartford Accident and Indemnity Co., 136 N.J. Super. 572, 578, 347 A.2d 371 (App.Div. 1975), certif. den. 70 N.J. 137, 358 A.2d 184, (1976). Therefore, any application for an award of counsel fees for legal services performed in connection with the first appeal should have been made to this court. In re Estate of Burke, 48 N.J. 50, 58-59, 222 A.2d 273 (1966).
Third, the trial court did not give careful consideration to the credibility or reasonableness of the billings of the homeowners' attorneys. The hours billed to this case by the homeowners' *615 attorneys appear on their face to be excessive. For example, the homeowners' trial attorney charged the following hours, which the trial court allowed in full:

 January 8, 1988 16.20 hours
 January 12, 1988 18.50 hours
 January 18, 1988 15.40 hours
 January 19, 1988 16.10 hours
 January 22, 1988 18.20 hours
 January 23, 1988 17.00 hours
 January 24, 1988 17.70 hours
 January 25, 1988 15.20 hours
 February 22, 1988 18.45 hours
 February 23, 1988 16.25 hours
 February 24, 1988 15.90 hours
 February 25, 1988 17.85 hours
 February 26, 1988 17.40 hours
 February 28, 1988 16.40 hours
 February 29, 1988 20.00 hours
 March 1, 1988 23.00 hours
 March 2, 1988 15.10 hours

At a minimum, the very high hours billed to this case by the homeowners' attorneys should have alerted the trial court to the need for a meticulous review of the application for attorneys' fees.[8] But the trial court simply stated, "I accept as *616 correct the calculations which have been made," without further elaboration.
Fourth, the trial court failed to take into consideration the amount genuinely in dispute in determining whether the fees sought by the homeowners were reasonable. Although there is no requirement that an award of attorneys' fees be proportionate to damages, "the amount of damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded...." Riverside v. Rivera, 477 U.S. 561, 574, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466, 479 (1986); see also Singer v. State, supra, 95 N.J. at 500, 472 A.2d 138; Wisser v. Kaufman Carpet Co., 188 N.J. Super. 574, 579, 458 A.2d 119 (App.Div. 1983).
Fifth, there was clearly no basis for any upward adjustment in the "lodestar" amount. As previously noted, that amount may be increased only in "rare" and "exceptional" cases. Pennsylvania v. Delaware Valley Citizens' Council, supra, 478 U.S. at 565, 106 S.Ct. at 3098, 92 L.Ed.2d at 456. The trial court erred in viewing the "quality" of legal services as a basis for such an increase. Id. 478 U.S. at 566, 106 S.Ct. at 3098 ("[I]t is unnecessary to enhance the fee for superior performance."). The court also erred in viewing the "quantity" of those services as a basis for an upward adjustment. Rather, as previously discussed, the quantity of services appears to be excessive. Moreover, the uncertainty as to the ultimate result was not a basis for any adjustment in the fee. See Pennsylvania v. Delaware Valley Citizens' Council, supra, 483 U.S. at 727, 107 S.Ct. at 3087, 97 L.Ed.2d at 599 ("multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible under the usual fee-shifting statutes.").
*617 Consequently, if the homeowners again prevail on their consumer fraud claims upon remand, the award of counsel fees must be redetermined in accordance with the principles set forth in this opinion.

VII
On their cross appeal, the homeowners contend that the consumer fraud claims of 24 rather than 16 homeowners should have been submitted to the jury.
At the original trial in December 1984, the court determined that only the 13 homeowners who purchased their homes in reliance on the reference in CMG's brochure to "insulated windows" were entitled to recover damages under the Consumer Fraud Act. See Chattin v. Cape May Greene, Inc., supra, 216 N.J. Super. at 624, 524 A.2d 841. On appeal, we ruled that two additional homeowners who allegedly relied upon similar oral representation also were entitled to pursue consumer fraud claims against CMG. Id. at 641, 524 A.2d 841. After our remand to the trial court, the parties agreed at a case management conference that 15 homeowners were entitled pursuant to our opinion to proceed on their consumer fraud claims at the retrial. In order to memorialize this understanding, CMG made a motion to limit the number of claimants to 15. This motion was granted on November 30, 1987.[9] It was not until six weeks later that the homeowners first asserted their position that there were 24 homeowners with claims eligible for submission to the jury.
Under these circumstances, we conclude that the trial court did not abuse its discretion in limiting the consumer fraud claims which could be presented to the jury. The case was *618 more than nine years old and had been on remand for nearly a year when the homeowners attempted to expand the class of consumer fraud claimants. Consequently, the trial court was understandably reluctant to grant relief to the homeowners which undoubtedly would have required additional discovery and thus further delayed the retrial. Moreover, the homeowners failed to present any good reason for failing to seek such relief sooner.

VIII
On their cross appeal, the homeowners also contend that the trial court erred in denying their motion to enforce a 1978 arbitration award in the amount of $10,850 against CMG.
Most of the facts pertinent to this issue are set forth in our first opinion. 216 N.J. Super. at 622-623, 632-633, 524 A.2d 841. In brief, some homeowners in Kings Bay West filed claims for arbitration against CMG pursuant to homeowners warranty agreements. The arbitrator decided in favor of the homeowners and ordered CMG to install ventilation systems and to repair the damage already caused by condensation. The arbitrator also directed that if this work were not completed within 60 days, CMG would have to pay each homeowner $350 "in full settlement of all claims." CMG filed suit against the homeowners to enjoin enforcement of the arbitration award. The homeowners filed a third party complaint against Insurance Company of North America (INA), which was the insurer of CMG's obligations under the homeowners' warranty program.[10] On October 29, 1982, the trial court granted INA's motion to dismiss all claims against it in exchange for the deposit into court of the amount of the 1978 arbitration award. *619 However, the parties entered into a consent order on November 29, 1984, in order to avoid a conflict of interest on the part of the trial judge, which allowed INA to withdraw all funds it had deposited into court and provided that the homeowners claims against INA would be extinguished.[11]
After the issuance of our original opinion which rejected the arbitrating homeowners claims to additional damages, the homeowners moved before the trial court to enforce the arbitration award against CMG. However, the trial court ruled that the homeowners' consent to INA's withdrawal of the amount it had deposited into court barred them under the principles of waiver and estoppel from enforcing the arbitration award against CMG.[12] We disagree and therefore reverse this ruling.
It is clear on the face of the consent order dismissing the homeowners' claims against INA that they did not waive any claims against CMG. That order specifically states that "by consenting to the form and entry of the Order the Plaintiffs Homeowners and specifically the subclass of Homeowners herein referred to above do not waive any claims for damages or legal argument that Cape May Greene, Inc. and Capitol Products Corporation are legally responsible for payment of damages directly to plaintiffs."
It is also clear that the efforts of the arbitrating homeowners to recover additional damages for breach of warranty, negligence and violations of the Consumer Fraud Act did not constitute a waiver of their rights to the arbitration award. As we noted in our original opinion,

*620 [T]he arbitrating homeowners never attempted to repudiate the arbitration award. On the contrary, they consistently defended their entitlement to the award.... [P]laintiffs filed a pretrial memorandum which included a statement that "[the arbitrating homeowners] claim that they as a subclass have a right to accept the $350.00 and proceed for excess damages against both defendant, Capitol Products, not a party to the arbitration, and the plaintiff, Cape May Greene, Inc." [216 N.J. Super. at 632-633, 524 A.2d 841; emphasis in original].
Cf. Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229, 242, 139 A.2d 281 (1958) (acceptance of a lesser sum while continuing to demand a greater sum does not constitute waiver of claim for greater sum).
We also see no basis for application of principles of estoppel against the homeowners. The doctrine of judicial estoppel provides "that a party who, with knowledge of the facts, has assumed a particular position in judicial proceedings, and has succeeded in maintaining that position, is estopped to assume a position inconsistent therewith to the prejudice of the adverse party." Brown v. Allied Plumbing & Heating Co., 129 N.J.L. 442, 446, 30 A.2d 290 (Sup.Ct. 1943), aff'd 130 N.J.L. 487, 33 A.2d 813 (E. & A. 1943) (emphasis added); see also Vogel v. Red Star Express Lines, 73 N.J. Super. 534, 542, 180 A.2d 351 (App.Div. 1962), aff'd 40 N.J. 44, 190 A.2d 666 (1963). In the present case, the arbitrating homeowners were wholly unsuccessful in their assertions that the arbitration award was not binding. Chattin v. Cape May Greene, Inc., supra, 216 N.J. Super. at 632-638, 524 A.2d 841.[13] Accordingly, the doctrine of judicial estoppel did not prevent them from seeking to confirm the arbitration award.
Indeed, principles of estoppel may be more appropriately applied to preclude CMG from now attempting to disclaim its obligations under the arbitration award. CMG argued in its *621 brief submitted on the first appeal to this court that a pretrial ruling of the trial court constituted, in effect, confirmation of the arbitration award:
Judge Neustadter eventually confirmed the Award in any event, by holding that it was binding and preclusive.... Even during the course of the instant litigation, Defendant [CMG] argued that if the arbitrator had jurisdiction, all parties were bound by the Award.
Consequently, the trial court erred in permitting CMG to disclaim its obligations under the 1978 arbitration award.[14]
Accordingly, we reverse the judgment in favor of the homeowners and remand the case for a retrial on liability only. We also reverse the trial court's denial of the homeowners' motion to enforce the 1978 arbitration award and direct that a judgment be entered in that amount plus any interest the court may award.
BRODY, J.A.D., dissenting in part.
I dissent only from part I of the court's opinion. We previously remanded this matter to retry the issue of whether CMG committed fraud as defined by the Consumer Fraud Act. In doing so, we reversed the trial judge's directed verdict. The judge had ruled that as a matter of law CMG's representations that its new houses contained "insulated aluminum windows" and "insulated windows" meant that the entire window unit, including the frame, was insulated and not simply that the panes were insulated. We explained:
Although there may be some circumstances in which an advertisement is so patently deceptive that a violation of the Consumer Fraud Act may be found as a matter of law, the determination whether an advertisement is misleading is ordinarily for the trier of fact  here the jury  to decide. Indeed, a jury would appear especially well suited to determine the impact of an advertisement upon "an average consumer."

*622 In this case it was undisputed that the windows installed in the homes sold to plaintiffs have a double pane of glass which provides insulation. It was also undisputed that the aluminum frames of the windows have no insulating features. The factual issue which should have been submitted to the jury was whether the average consumer would understand the term "insulated aluminum windows" to refer only to the glass or to the entire window unit. [Chattin v. Cape May Greene, Inc., 216 N.J. Super. 618, 639, 524 A.2d 841 (App.Div. 1987), certif. den. 107 N.J. 148, 526 A.2d 209 (1987) (quoting from Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69, 494 A.2d 804 (1985)).]
In keeping with our remand, the trial judge upon retrial submitted to the jury the very interrogatories that we had directed. The first two special interrogatories and the jury's responses are as follows:
Would the average consumer understand the term "insulated aluminum windows" to refer only to the glass or to the entire window unit? (Check one)
 Only the glass _______________
 Entire window unit X 
Would the average consumer understand the term "insulated windows" to refer only to the glass or to the entire window unit? (Check one)
 Only the glass _______________
 Entire window unit X 
The jury's answers to these interrogatories should end the matter respecting liability under the Act. The Act deems a seller to have committed a fraud by making a misrepresentation, without requiring the buyer to prove that the seller intended to deceive. N.J.S.A. 56:8-2; Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 378, 371 A.2d 13 (1977). See also D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 22, 501 A.2d 990 (App.Div. 1985). CMG acknowledges that if "window" is understood to mean the entire window unit, including the frame, the windows were in fact not insulated as represented. Thus the jury did not simply find that CMG's brochure was misleading, but that it was misleading by the definition of the words it used, not by the absence of the words that it omitted.
The majority finds fault with how the judge went about instructing the jury respecting whether CMG committed a *623 fraud under the Act, an issue given to the jury by a separate interrogatory that it answered in the affirmative. Even if that interrogatory were not superfluous, as I believe it was, the instructions could not have led the jury to an unjust verdict.
The majority criticizes the judge primarily for failing to instruct the jury that under the Act an omission, unlike a misrepresentation, is not fraudulent unless the person making the omission does so knowingly with the intent that others rely upon it. I reiterate that the jury found that there was a misrepresentation, i.e. that the window frames were insulated, not an omission.
In any event, as I read the record, the judge's charge made the distinction that the majority holds should have been made. In recapitulating his instructions respecting the definition of fraud under the Act, the judge said the following to the jury:
So, first, that there was either a written or oral representation as to the insulated nature of the windows. Secondly, that each individual plaintiff, or as the case may be plaintiff couples, heard and/or read the representation regarding the windows. Thirdly, that this representation was false, or it had the capacity to mislead an average consumer into believing that he was getting something other than that which in fact the consumer purchased, or indeed, as I said, with the knowing concealment, suppression, or omission of a material fact with the intention that the home buyer rely on that concealment, suppression, or omission in connection with the purchase of his or her home. And, finally, that the representation in question was a proximate cause of an ascertainable loss to the plaintiffs.
That instruction comports with the language of the Act and satisfies any need that there may have been to tell the jury that a seller's omission is not fraudulent under the Act unless he made the omission knowingly with the intent that the buyer rely on it. I find nothing earlier in the judge's charge that contradicts what he said in that recapitulation.
I agree with the majority that the trial judge made reference to "unconscionable commercial practice" without giving that expression its legal definition. I fail to see, however, how it hurt CMG even if the judge led the jury to believe that it could not find fraud under the Act unless CMG was guilty of "unconscionable" conduct. After all, the common meaning of "unconscionable" *624 is "unscrupulous," Webster's Third New International Dictionary (1966), a higher standard of liability than is required by the Act.
I would not further prolong this over-litigated matter by requiring a third trial to determine from another jury what already has been properly determined by this jury.
NOTES
[1] Although the homeowners' negligence and breach of warranty claims involved both the windows and doors in the homes, their consumer fraud claims involve solely the windows.
[2] CMG argues that if its use of the term "insulated windows" was at all misleading, it was solely due to omission of the fact that the window frames were uninsulated, and hence the jury should have been instructed that intent was a necessary element of the homeowners' cause of action. However, we are satisfied that the use of the term "insulated windows" could be viewed as either an affirmative misrepresentation of fact or an omission of material fact. Consequently, it was appropriate for the trial court to submit both alternative theories of liability to the jury.
[3] We note that model jury charges with respect to claims under the Consumer Fraud Act were adopted prior to the retrial of this case. See Model Jury Charges (Civil) § 4.22 (April 1, 1987).
[4] In addition, when the Division of Consumer Affairs has adopted a regulation expressly prohibiting a particular commercial practice found to be deceptive or unconscionable, the parties subject to the regulation are assumed to be familiar with its requirements and may be found to have committed a violation without a showing of intent. See Fenwick v. Kay American Jeep, Inc., supra, 72 N.J. at 378, 371 A.2d 13. No administrative regulation is involved in this case. See Chattin v. Cape May Greene, Inc., supra, 216 N.J. Super. at 639, 524 A.2d 841.
[5] If the jury again finds CMG liable for consumer fraud, the trial court will be required, for the reasons set forth in section VI of this opinion, to redetermine the award of counsel fees.
[6] CMG does not argue that the jury at the second trial should have been asked to consider Capitol's liability on any basis other than consumer fraud. Therefore, we have no occasion to consider whether one defendant found liable for negligence or breach of warranty and another defendant found guilty of consumer fraud may be considered joint tortfeasors under the Joint Tortfeasors Contribution Law. Cf. Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 566-568, 410 A.2d 674 (1980) (manufacturer of defective product held liable on strict liability theory and retailer held liable for negligently servicing the product held jointly liable under Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 et seq.).

In any event, the judgment entered after the second trial consists almost entirely of attorney fees awarded pursuant to the Consumer Fraud Act and "punitive" consumer fraud damages because, as noted in the final paragraph of section II of this opinion, CMG received a credit for the amount of the judgment for compensatory damages for negligence and breach of warranty after the first trial. Thus, any credit to which CMG might be entitled based upon the liability of Capitol on a theory other than consumer fraud would be limited to the compensatory aspect of the damages assessed for consumer fraud, which was a negligible part of the judgment entered after the second trial (i.e., the difference between the damages of $533 per window determined by the first jury and $550 per window determined by the second jury). See Neveroski v. Blair, supra.
[7] We reject, for substantially the reasons expressed by the trial court, CMG's argument that the award of attorneys' fees to the homeowners should be limited to one-third of the recovery by virtue of either (1) the trial court's March 23, 1979 opinion approving a retainer agreement between the homeowners and their counsel providing for counsel fees of one-third of the homeowners' total recovery or $75 per hour, whichever was less and (2) the determination at the end of the first trial to award the homeowners counsel fees in the amount of one-third of the homeowners' damage recovery, i.e., a fee of $112,781.50. See also Blanchard v. Bergeron, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). We also note that the issue of whether the award of attorneys' fees to homeowners should be limited to one-third of the amount of their damages was not "litigated and decided" at the first trial. See Sisler v. Gannett Co., 222 N.J. Super. 153, 159, 536 A.2d 299 (App.Div. 1987), certif. den. 110 N.J. 304, 540 A.2d 1283 (1988).
[8] CMG strenuously argues that the trial court erred in denying its application for a plenary hearing with respect to the homeowners' application for attorneys' fees. In denying that application, the trial court noted that CMG had failed to identify with particularity those aspects of the homeowners' fee application which were in dispute, and the court understandably expressed concern about conducting an "amorphous hearing where the affidavit of services will be gone over line by line." We agree with the trial court that a party against whom attorneys' fees are sought should not be allowed to make a generalized request for a hearing without identifying specific areas of factual dispute. Cf. Cohen v. Fair Lawn Dairies, 44 N.J. 450, 452, 210 A.2d 73 (1965). However, there are means available to a trial court short of scheduling a plenary hearing for assuring that a fee application is fairly based on an adequate record, such as allowing the opposing party to conduct depositions and/or requiring the moving party to submit supplemental affidavits. Such procedures can help to focus upon any areas of genuine factual dispute which must be the subject of an evidentiary hearing. It is especially appropriate to utilize such procedures in a case such as this where substantial fees are sought and the moving papers raise serious questions as to the reasonableness of those fees.
[9] As discussed in section IV of this opinion, the trial court later modified this order to allow 16 homeowners to pursue consumer fraud claims against CMG because an examination of the transcript of the first trial revealed that one additional homeowner testified at the first trial that he had relied upon CMG's brochure.
[10] The original third party complaint identified American Banker's Insurance Company of Florida as the insurer of CMG's homeowners' warranty obligations. However, it was subsequently determined that INA was the party that had insured these obligations and therefore was the proper third-party defendant.
[11] This order was not brought to our attention during the first appeal. Consequently, we stated in our first opinion that the sum deposited into court by INA "presumably remains available for distribution." 216 N.J. Super. at 633, 524 A.2d 841.
[12] This ruling was apparently never memorialized by an order, although it is indirectly reflected by the omission of the amount of the arbitration award from the judgment.
[13] The record also does not support the trial court's finding that CMG was prejudiced by the order dismissing INA from the action. INA did not owe any duty to CMG; its duty was solely to the homeowners. And even if CMG were to be deemed to have had some rights against INA, it expressly preserved those rights in the consent order dismissing INA.
[14] Plaintiffs also seek interest on the amount of the arbitration award. However, since the trial court did not pass upon this claim and other aspects of the case must be remanded in any event, the trial court should consider this claim in the first instance.